Exhibit 3    Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

```
* * * * * * * * * * *  CIVIL ACTION NUMBER:
GILBERT DAUPHINE, JR. * 2:16-cv-15370
                      *
VERSUS                * SECTION "B"
                      *
REC MARINE LOGISTICS, * JUDGE IVAN L.R. LEMELLE
LLC, ENERGY XXI USA,  *
ENERGY XXI GULF COAST,* MAG. JUDGE JANIS VAN
INC. AND ENERGY XXI,  * MEERVELD
LTD.                  *
* * * * * * * * * * *
```

           30(b)(6) Deposition of REC MARINE

LOGISTICS, LLC., through its corporate

representative, RONALD E. CHADDOCK, taken on

Tuesday, November 7, 2017, commencing at

1:10 p.m., in the offices Pusateri, Johnston,

Guillot & Greenbaum, Attorneys-at-Law, 1100

Poydras Street, Suite 2250 - Energy Centre, New

Orleans, Louisiana 70163.

1    A.    I can read on here.  It says "Master
2    Time Charter Agreement."
3    Q.    Do you know whether that is a Master
4    Time Charter Agreement that was executed in
5    May of 2010 by REC Marine?
6    A.    I'm not sure.
7    Q.    All right.  Well, who was in charge of
8    executing time charter agreements for REC Marine
9    in May of 2010?
10   A.    May I look through it?
11   Q.    Sure.
12   A.    I see Brian Barthelemy signed this
13   document.
14   Q.    He signed as the operations manager?
15   A.    Yes, sir.
16   Q.    And for whom was Brian Barthelemy
17   working at the time he executed the agreement?
18   A.    Who was he working for?
19   Q.    Who was he working for at that time?
20   A.    REC Marine.
21   Q.    As operations manager?
22   A.    Yes, sir.
23   Q.    Do you know Mr. Barthelemy?
24   A.    Yes, sir.
25   Q.    Is he still working for REC Marine?

1    Q.   Okay.  And so then I ask -- then the
2    second topic, and you can read it with me, "The
3    May 15th, 2010 Master Time Charter between REC
4    Marine and Energy XXI, including indemnity and
5    additional insured provisions."  Now, you said
6    you'd never seen it before, but you did identify
7    Mr. Barthelemy's signature, correct?
8        A.   Yes, sir.
9        Q.   And at the time was he authorized to
10   enter into master time charters with your
11   customers?
12       A.   Yes, sir.
13       Q.   Do you know whether or not REC Marine
14   ever canceled this Master Time Charter
15   identified as Exhibit 1 between it and Energy
16   XXI?
17       A.   Not to my knowledge.
18       Q.   Does your company still work for Energy
19   XXI?
20       A.   Yes, sir.
21       Q.   Would you agree then that if your
22   company signed a master time charter agreement
23   with Energy XXI governing the work that you
24   perform for Energy XXI, then all of your charter
25   of vessels would go back to this master time

1  sometime over the summer; and no, I did not
2  speak to Blaine about that.
3      Q.   Who did you speak to within your
4  company in order to prepare yourself for this
5  corporate deposition?
6      A.   No one.
7      Q.   What documents did you review at your
8  company in order to prepare yourself for this
9  corporate deposition?
10     A.   None.  I saw a handful of them when I
11 got here.
12     Q.   Your attorneys handed you some when you
13 got here?
14     A.   Yes, sir.
15     Q.   But you didn't do any investigation on
16 your own within your company --
17     A.   No, sir.
18     Q.   -- to prepare yourself for this
19 deposition?
20     A.   No, sir.
21     Q.   What do you know about the incident of
22 October 9, 2015 involving Gilbert Dauphine?
23     A.   Minor details.  I think a -- Gilbert
24 Dauphine, deckhand on the back deck, the crane
25 operator lowered a basket on top of him.

1    A.    We've got two vessels.
2    Q.    Which ones are those?
3    A.    It's the EMILY D -- no, I'm sorry. I
4  take that back. It's the CAPTAIN RON and the
5  MS. TAYLOR.
6    Q.    When was the last time the EMILY D was
7  on charter?
8    A.    Maybe over a year ago.
9    Q.    Based on what you see in Exhibit 2, was
10  the EMILY D on charter to Energy XXI on the date
11  of Mr. Dauphine's accident?
12    A.    Based on this charter agreement?
13    Q.    Yes. He was injured on October the
14  9th, 2015.
15    A.    Correct. It doesn't say anywhere on
16  this charter agreement.
17    Q.    Okay.
18    A.    But we looked at an invoice and we know
19  the vessel was on charter at that time.
20    Q.    It was on charter to Energy XXI?
21    A.    Yes, sir.
22    Q.    Do you know if it was working at South
23  Pass 57B?
24    A.    I do not know the exact location.
25    Q.    But you do know that it was working for

1      Energy XXI?
2      A.   Yes, sir.
3      Q.   At the time of Mr. Dauphine's accident?
4      A.   Yes, sir.
5      Q.   No doubt about that?
6      A.   No doubt about it.
7      Q.   Since you haven't read Exhibit 1, I
8  want to say for the record that at this time I'm
9  not going to ask you any questions about the
10 document, but I'm going to reserve the right to
11 ask questions of a person at REC Marine with
12 knowledge of master time charter agreements
13 since you say you have really no knowledge of
14 what knock-for-knock or reciprocal indemnity
15 means.  Do you understand that?
16     A.   No, but I think we went over it, you
17 kind of explained to me your definition of it.
18     Q.   Yeah.  You said you didn't know about
19 that.
20     A.   No.  I said I do know, but what is your
21 definition?
22     Q.   Okay.  You do know about reciprocal
23 indemnity agreements?
24     A.   No, I do not know about -- I said --
25 you asked about knock-for-knock.

1      Reserving my earlier objection
2  regarding the witness that's been produced as
3  the corporate representative of REC Marine, I'm
4  going to attempt to ask some of the questions
5  that I have.
6  RE-EXAMINATION BY MS. LOWE:
7      Q.   Mr. Chaddock, referring to Exhibit 1,
8  the Master Time Charter Agreement between REC
9  Marine and Energy XXI, you testified earlier
10 that this was signed by Brian Barthelemy,
11 correct?
12     A.   Yes, ma'am.
13     Q.   And you testified that he had authority
14 on behalf of REC Marine to sign this, correct?
15     A.   Yes, ma'am.
16     Q.   And would you agree that by signing
17 this contract on behalf of REC Marine, he was
18 agreeing to all the terms and provisions
19 included in this contract, correct?
20     A.   I would have to turn to my attorneys
21 for advice.
22     Q.   What is your understanding -- if he
23 signs this contract, wouldn't that mean to you
24 that he was accepting the terms and provisions
25 in the contract?

Page 122

1    October 9th, 2015?
2         A.   Are you implying to one?
3         Q.   What is REC's position?  Is there any
4    written document that applied to the charter of
5    that vessel?
6         A.   This is the one -- this is the charter
7    agreement (indicating) that we signed back on
8    May 22nd, 2015 for the charter of the EMILY D.
9         Q.   You're referring to Exhibit 2?
10        A.   Yes, ma'am.
11        Q.   And who is Bubba Richard, or Richard,
12   that signed this document?
13        A.   Bubba, I'm not sure of his exact title,
14   but Bubba Richard is -- would be what I would
15   consider traffic or minor dispatch.  Like I
16   said, I'm not sure of his title.
17             MR. KHOURY:
18                  Just as some housekeeping, the one
19   that Bert handed him didn't have Bubba Richard's
20   signature.  I have that one if you want --
21             MS. LOWE:
22                  I have that one, too.
23             MR. KHOURY:
24                  But the one -- this one doesn't
25   have his signature.

Page 124

1    written document or otherwise, that contains the
2    signatures of someone on behalf of REC Marine
3    and someone on behalf of Energy XXI other than
4    this Master Time Charter Agreement, Exhibit 1?
5        A.   No, ma'am, I'm not aware of any other
6    documents.
7        Q.   Is it REC Marine's position that this
8    Master Time Charter Agreement dated May 15, 2010
9    did not apply to the charter of the M/V EMILY D
10   on October 9th, 2015?
11       A.   I would turn to my attorneys for the
12   advice on what applied in that time charter --
13       Q.   But I'm not asking for a legal -- I'm
14   asking for your position, your opinion.
15       A.   And my opinion would be I would take
16   the advice of my legal.
17       Q.   Okay.  So you don't have an opinion
18   either way?
19       A.   I don't have an opinion, no, ma'am.
20       Q.   So REC Marine has no position
21   whatsoever on whether this Master Time Charter
22   Agreement applied to the charter of the EMILY D
23   on October 9th, 2015?
24            MR. KHOURY:
25                 Object to form.

1        THE WITNESS:
2              As of today, no.
3    BY MS. LOWE:
4        Q.   But you would agree that REC Marine
5    never terminated this Master Time Charter
6    Agreement with Energy XXI, correct?
7        A.   I would agree, yes, ma'am.  Not to my
8    knowledge.
9        Q.   Can you take a look at the Master Time
10   Charter Agreement for me and flip to Page 3.
11   And under Paragraph III "Designation of Vessel -
12   Commencement of Hire," could you just to
13   yourself read that first paragraph underneath
14   that for me, that title, that heading.
15       A.   Okay.
16       Q.   And obviously I'm paraphrasing, but
17   would you agree that that paragraph contemplates
18   that a separate charter agreement will be issued
19   pursuant to this Master Time Charter for a
20   particular vessel that will be chartered from
21   REC Marine?
22       A.   That's the way I interpret it, yes.
23       Q.   So can you then tell me why this May
24   2nd, 2015, Exhibit 2, why that is not a separate
25   charter agreement as contemplated by this

1  it says here in this Master Time Charter
2  Agreement?
3      A.   You just read it, yeah.  That's exactly
4  what it says.  Now, what form they're referring
5  to, I'm not aware of.
6      Q.   Okay.  This charter agreement,
7  Exhibit 2, says that the EMILY D was chartered
8  to Energy XXI; what Energy XXI entity?
9      A.   I'm not sure.
10     Q.   So how do we know that this applies?  I
11 mean, who chartered the vessel?
12     A.   Energy XXI chartered the vessel.
13     Q.   So it could mean that Energy XXI
14 Services chartered the vessel, right?
15     A.   Um --
16     Q.   Certainly -- what is REC Marine's
17 position on which Energy XXI entity chartered
18 the EMILY D on October 9th, 2015?
19     A.   I mean, we have different -- I don't
20 know how the corporate structure is of Energy
21 XXI, nor do I know whose responsibility it is to
22 delegate what entity the vessel's working for at
23 that time.
24     Q.   Okay.  So you would defer to Energy XXI
25 then as to what Energy XXI the EMILY D is

1    working for on October 9th, 2015?
2            MR. KHOURY:
3                 Object to form.
4            THE WITNESS:
5                 I wouldn't defer to them -- now, I
6    think, typically they would let me know in the
7    beginning.
8    BY MS. LOWE:
9       Q.   Because you don't know the corporate
10   structure of Energy XXI, right?
11      A.   Correct.
12      Q.   And so you would defer to Energy XXI
13   who does know its own corporate structure,
14   right?
15      A.   Yes.
16      Q.   And knows which entities are chartering
17   vessels, correct?
18      A.   Yes.
19      Q.   So just back to my other question
20   though.  Does REC Marine know what entity --
21   does it have a position as to what entity,
22   Energy XXI entity, the EMILY D was working for
23   on October 9th, 2015?
24      A.   The only thing I can go by is what we
25   were paid, which I'm not sure the check, but I

Page 131

1   think we were paid by Energy XXI Gulf Coast.
2        Q.   Why does who you were paid by determine
3   what entity the vessel was being chartered by?
4        A.   It would seem whoever you're working
5   for is who's going to pay you, right.  I would
6   assume.
7        Q.   Well, then why does this charter
8   agreement not have the same name of the people
9   that wrote the check?
10       A.   So we send that to Energy XXI, they
11  sign typically if they want to make any changes
12  or notes they want noted on there, they're
13  invited to note on there, and send it back.
14       Q.   Okay.  So, Mr. Chaddock, do you have
15  any position whatsoever as to who the EMILY D --
16  which Energy XXI entity the EMILY D was working
17  for on October 9th, 2015?
18       A.   I do not know.
19       Q.   Okay.
20       A.   Other than the check stub that was
21  provided who we were paid from.
22       Q.   Came from who?
23       A.   It was Energy XXI Gulf Coast.
24       Q.   If the Energy XXI corporate
25  representative testified that Energy XXI Gulf

```
 1              MR. KHOURY:
 2                   Object to the form.
 3              THE WITNESS:
 4                   I mean, it's Energy XXI.
 5     BY MS. LOWE:
 6         Q.   And you would agree those invoices are
 7     sent to Energy XXI because REC Marine works for
 8     Energy XXI collectively?
 9              MR. KHOURY:
10                   Object to the form.
11     BY MS. LOWE:
12         Q.   Do you decide what entity your vessels
13     work for for Energy XXI?
14         A.   No, ma'am.
15         Q.   So when you send these invoices, who
16     are you expecting payment from?
17         A.   I don't -- it really doesn't bother me
18     who pays it, as long as they pay me.
19         Q.   You don't know?
20         A.   No.
21              MR. CASS:
22                   Are you attaching those?
23              MS. LOWE:
24                   Yeah.  What number are we on?
25              THE COURT REPORTER:
```