Exhibit 5



**enerqy** **XXI**
THE EXPLORATION CO.

## MASTER TIME CHARTER

### NOTE: THIS AGREEMENT CONTAINS INDEMNITY AND RELEASE PROVISIONS

THIS MASTER TIME CHARTER (the "Agreement"), is executed on *May 13, 2010* by and between the Parties herein designated as "Owner" and "Charterer."

**Owner:**

Owner's Address:

Owner's Fax: Owner's

Telephone: Owner's

FEIN: Owner's email:

Charterer: Energy XXI Services, LLC

Charterer's address: 1021 Main, Suite 2626, Houston 77002

Charterer's telephone: 713-351 -3146

Charterer's fax: 713-351-3346

Charterer's email: gmeaux@energvxxi.coin

This Agreement, for and in consideration of the mutual undertakings herein set forth, the sufficiency of which is hereby acknowledged, shall govern the chartering of certain vessels for the purpose of facilitating the exploration for and production of oil, gas and other minerals for use by those at interest with Charterer (including of oil field supply, utility, crew and other vessels).

I.   **DEFINITIONS.**

A.   **Owner.** All parties to this Agreement acknowledge that Owner may be a charterer of a Vessel, as defined herein, delivered to Charterer in accordance with this Agreement and/or any Vessel Charter, or may be acting in some capacity other than as the title owner of such Vessel. Accordingly, the term "Owner" as used in this Agreement shall include (a) the party signing as Owner in this Agreement; (b) any parent of such party; (c) any subsidiaries and affiliates of (a) and (b); and, (c) the title owner(s) and/or operator of any such Vessel; and (d) employees of (a), (b), and (c).

B.   **Charterer.** "Charterer" shall mean the entity listed on page one of this Agreement, which is requesting for its own account that Owner provide vessel(s) and/or services to such entity. The execution of this Agreement by two or more entities shall not create joint and several liability for these entities with respect to any vessel(s) and/or services provided by Owner for these entities. Owner shall be in privity of contract with respect to such vessel(s) and/or services provided only with the entity requesting the vessel(s) and/or services. Similarly, the entity requesting the vessel(s) and/or services shall be solely liable to Owner with respect to such vessel(s) and/or services provided pursuant to the terms and conditions of this Agreement.

The words "Contractor" and "Vendor" as used in any Exhibit or Schedule attached to this Agreement shall mean "Owner."

II.   **REPRESENTATIONS OF OWNER.**

The party signing as Owner hereby warrants (a) that it shall perform or be responsible for the performance of each and every obligation and duty delegated to Owner under this Agreement and/or any Vessel Charter; (b) that the title owner(s) and/or operator(s) and/or prior charterer(s) shall be in compliance with each and every obligation and duty delegated to Owner under this Agreement and/or any Vessel Charter; (c) that Owner shall be completely responsible to Charterer for all acts and/or omissions on the part of each and every employee of the title owner(s) and/or operator(s) and/or prior charterer(s), as well as for all acts and/or omissions on the part of any and all of its own employees; (d) that it is the intent of Owner and Charterer that Charterer shall at all times be entitled to look to the party signing this agreement as Owner for compliance with each and every obligation and duty delegated to Owner under this Agreement and/or any Vessel Charter as if the party signing as Owner were the sole owner and operator of each and every Vessel; and (e) where this Agreement imposes an obligation upon Owner to waive certain rights and/or refrain from committing certain acts, its parent, subsidiaries and affiliates and all other entities for which Owner is responsible hereunder also waive such rights and agree to refrain from committing such acts.

Owner and Charterer recognize that loading and discharging of cargo or personnel may be a hazardous operation and that the master has special expertise in the placement and securing of the cargo and in determining whether loading and unloading of cargo and personnel can be conducted safely. It is the expectation of Owner and Charterer that the master shall exercise great care and utilize his special expertise in the placement of the cargo and in the manner in which it is secured and in determining whether loading and unloading can be conducted safely.

2

EXXI000099

Owner warrants that any Vessel, as defined herein, made the subject of a Vessel Charter is seaworthy and further warrants that during the term of any particular Vessel Charter it shall maintain said Vessel in seaworthy condition and good working order capable of performing the services incidental to the operations of Charterer in exploring for and producing oil, gas and other minerals. Owner represents and warrants that, throughout the term of the particular Vessel Charter, the master and crew of the Vessel shall be trained by Owner to be familiar with and competent to operate the Vessel in connection with the operations of Charterer. Owner further warrants that, throughout the term of the particular Vessel Charter, the Vessel shall have a full complement of crew who shall be fully trained by Owner, licensed, documented and certified as required by law to perform the work.

## III. DESIGNATION OF VESSEL - COMMENCEMENT OF HIRE.

Charterer shall from time to time designate the Vessel or Vessels it desires to charter by notifying Owner of a particular vessel, together with all its apparel, equipment, appurtenances, spares and tackle (herein referred to as the "Vessel"), which Charterer desires to hire and by specifying the date on which Charterer desires the Vessel to be delivered. As soon thereafter as is practicable, Owner shall indicate its willingness to charter a particular Vessel by faxing or emailing to Charterer a letter in a form substantially identical to the form attached hereto as Schedule "A", which letter shall confirm the details (daily charter rate, term, etc.) of the charter and of the Vessel (hereinafter referred to as "Vessel Charter"), as between the parties. The Vessel Charter shall be binding upon Owner from the time this confirmation letter is received by Charterer unless the Vessel Charter is canceled by Charterer as described below. Even if Owner shall fail to send such confirmation letter or Charterer shall fail to acknowledge such letter, this Agreement shall apply to any Vessel delivered to Charterer by Owner unless the Vessel Charter is canceled by Charterer.

It is understood that Owner is under no obligation to let any of its Vessels and that Charterer is under no obligation to hire any of Owner's Vessels except those which Charterer may request during the term hereof, it being the intent of Owner and Charterer that this Agreement shall be a nonexclusive Vessel charter agreement until a particular Vessel has been requested by Charterer and confirmed by Owner. The Vessel shall be delivered to Charterer at the port specified in the applicable Vessel Charter. Charterer shall have the option to cancel the particular Vessel Charter if the Vessel has not been delivered to and accepted by Charterer on the date of delivery stated in the Vessel Charter. The Vessel shall, at the termination of the applicable Vessel Charter, be redelivered to Owner (unless lost) at the same port at which it was accepted by Charterer or at the closest available port, or at any other port mutually agreed upon by Owner and Charterer.

No Vessel Charter entered into by Owner and Charterer in accordance with the terms of this Agreement shall be construed as a bareboat charter of the Vessel.

## IV. PAYMENT.

Owner shall, at its sole cost and expense, man, operate, victual, navigate and supply the Vessel, and shall maintain the Vessel in good order and condition and shall make all necessary repairs thereto. Owner shall, at its sole cost and expense, provide all lube oils, grease, waste oil disposal, oil and oil changes, and mud hoses. Charterer agrees that fuel, fresh water, liquid mud and bulk tank cleaning, cement, repair of mud hoses when broken on the job, dunnage and replacement cordage shall be provided by Charterer at its sole cost and expense. At Charterer's option, however, Charterer may direct Owner to secure the same and reimburse Owner for the cost thereof Wharfage, port charges, permits, pilotage fees, clearance expenses, agency fees and dockages shall be provided by or reimbursed by Charterer at its sole cost and expense plus a handling charge of 10%. It is the intention of the Owner and Charterer that time shall be of the essence in each Vessel Charter; accordingly, notwithstanding the language in the preceding sentence, any wharfage,

3

EXXI000100

port charges, agency fees, dockages and/or other charges occasioned by Owner's delivery of the Vessel on any date other than the date stated in the applicable Vessel Charter (which expense would not have been incurred had the Vessel been delivered on the Date stated in the applicable Vessel Charter) shall be paid or reimbursed by Owner at its sole cost and expense. If the Vessel puts into a port for repairs or for causes for which the Vessel or Owner is responsible or for any reason which benefits only the Vessel or Owner, or if the Vessel incurs any other expense for any reason which benefits only the Vessel or Owner, any charges incurred in connection therewith shall be paid by Owner.

At Charterer's request, Owner agrees to furnish food and lodging for personnel, other than the master and members of the crew of the Vessel, at the rates set forth in the applicable Vessel Charter.

For the use of said Vessel, Charterer shall pay Owner charter hire at the daily charter rate agreed upon in the applicable Vessel Charter for each day or partial day, beginning on the day said Vessel is delivered to Charterer and continuing until the Vessel is redelivered or the applicable Vessel Charter is otherwise terminated in accordance herewith.

Owner shall bill Charterer at the address set forth in the applicable Vessel Charter, or at such other address as Charterer may from time to time designate in writing, at the end of each calendar month, and upon termination of the applicable Vessel Charter if it be terminated during any calendar month. Charterer shall pay Owner, within thirty (30) days after expiration of each billing period, the amount of charter hire and other fees due Owner for such period. If the Vessel is lost (actual or constructive loss as defined in the Vessel's hull policy) prior to the termination of the applicable Vessel Charter, payment shall be made up to and including the date of loss. If the date of the Vessel's loss is uncertain, then payment shall be made up to and including the day that the Vessel is last heard from Payment shall be made to Owner at the address set forth in the applicable Vessel Charter, or at such other address as Owner may from time to time designate in writing. Payment by Charterer of the Vessel's charter hire and/or of any other invoices presented by Owner to Charterer shall be without prejudice to Charterer's rights to subsequently challenge the correctness thereof.

## V.   TERMINATION.

Unless otherwise provided herein, this Agreement may be terminated by either Owner or Charterer upon thirty (30) days' advance written notice; provided, however, that such cancellation shall not be effective as to any Vessel which has been delivered to Charterer under the terms hereof until the minimum term of charter, if stipulated in the applicable Vessel Charter, has expired and such Vessel is redelivered to Owner. The primary term of any particular Vessel Charter shall be for the minimum term specified in the applicable Vessel Charter, commencing upon the date of acceptance of the Vessel by Charterer. The term shall continue for an indefinite time after such primary term until the applicable Vessel Charter is terminated for any reason by Charterer upon at least twenty-four (24) hours' prior notice.

## VI.   LICENSES. PERMITS. CERTIFICATES. LIENS AND COMPLIANCE WITH LAWS.

Owner and Charterer agree that the Vessel shall be employed solely in the movement of supplies, equipment and other materials and personnel in furtherance of Charterer's activities involving the exploration for and production of oil, gas and other minerals. Owner agrees to comply with all applicable classification society requirements and all applicable local, state and federal laws, rules and regulations, including without limitation all laws, rules, and regulations relating to the manning and operation of the Vessel and the employment of the master and crew, and including without limitation any applicable regulations relating to retirement,

4

EXXI000101

unemployment, compensation, maritime employment, and compensation for any injuries sustained by personnel aboard the Vessel. Owner acknowledges that its compliance with all laws, rules, and regulations, and all classification society requirements is material to this Agreement and that notwithstanding any other provision of Article VIII, Owner will indemnify Charterer for any damages, fines or penalties incurred by Charterer as a result of any breach of this obligation by Owner. Without limiting the generality of the foregoing, Owner warrants that all necessary licenses, permits and certificates which are required by law for the operation the Vessel as contemplated in the particular Vessel Charter shall be obtained by Owner. Owner warrants that there shall be compliance with all provisions of Title 46 of the United States Code, and Owner shall pay all fines and penalties and shall secure the release of (or bear the costs of paying for) the Vessel and/or all other properties seized or forfeited by reason of any violations or asserted violations of Title 46 of the United States Code.

For each vessel chartered under this Agreement, Owner agrees that it will provide Charterer with a copy of the U.S. Coast Guard Certificate of Inspection (COI) affecting the marine carriage and discharge of Noxious Liquid Substances (NLS) in bulk. Charterer and Owner agree that neither will load or cause to be loaded any bulk NLS not authorized by the vessel's COI. If Owner carries NLS for Charterer, then Charterer shall pay for the clean up of Owner's bulk tanks used for such carriage, and likewise for the removal and disposal of any cleaning residue resulting from said clean up. Charterer agrees to properly manifest all hazardous wastes and NLS waste carried aboard the vessel and to comply with all disclosure and filing requirements imposed by law as a result of such carriage.

Once obtained by Owner, Charterer shall carry aboard the Vessel at all times all of the licenses, certificates, documents and/or papers required by law to be aboard the Vessel.

Owner shall defend, indemnify and hold Charterer harmless from and against all maritime liens and other liens, claims, judgments, charges, encumbrances, suits and/or penalties which may be imposed upon or filed against Charterer by any authority for reasons of any asserted violation by Owner and/or the Vessel and/or the employees of Owner of any law or regulation. Owner further agrees to defend, indemnify and hold harmless Charterer and the Vessel from and against any and all manner of liens created and imposed upon the Vessel as result of the manning, operating, victualing, maintaining, supplying, navigating and/or managing of the Vessel. In the event of the seizure of the Vessel under legal process to enforce any lien or asserted lien, Owner shall secure the prompt release of the Vessel by bonding or other appropriate means. The charter hire provided for in the applicable Vessel Charter shall be suspended during any period in which the Vessel is under seizure by legal process. Notwithstanding anything to the contrary in Article VIII, Owner further agrees to defend, indemnify and hold Charterer harmless from and against any and all damages and expenses incurred by Owner and/or Charterer resulting from such seizure. Nothing in the foregoing shall be construed to impair Owner's lien rights against Charterer and/or others should Charterer be in breach of its obligations to Owner.

## VII.  INDEPENDENT CONTRACTOR.

Owner shall have exclusive possession and control of the operation, navigation and management of the Vessel during the term of the particular Vessel Charter. Charterer shall not have the right to control or direct the details of the work performed by Owner. Owner is an independent contractor having special expertise in the operation, navigation and management of the Vessel, and the employees of Owner are not to be considered servants, employees, "borrowed servants" or agents of Charterer, Charterer being interested only in the completed performance of the services herein provided. Owner and the master of the Vessel shall have the sole responsibility and obligation to evaluate weather and sea conditions and to determine whether any movement or operation of the Vessel (including loading and unloading) requested by Charterer maybe safely undertaken.

EXXI000102

VIII.  **INSURANCE. INDEMNITY AND DEFENSE.**

    **A.**    **Introduction.**

        **1.**    **Purpose.** The parties recognize that in connection with the use of the Vessels contemplated by this Agreement, there is some risk that accidents and events may occur in which property is lost, damaged or destroyed and/or in which persons may be killed or injured. The parties desire to allocate these risks between them and to require that these risks be adequately insured so as to minimize the possibility of disputes and to engage in effective risk management. For these reasons, the parties agree to the insurance requirements, mutual indemnities and defense obligations set forth below.

        **2.**    **Relationship Between Insurance and Indemnity Obligations.** The parties agree that the indemnity and insurance obligations contained in this Agreement are separate and apart from each other, such that failure to fulfill the indemnity obligations does not alter or eliminate the insurance obligations or vice versa. The parties further agree that the insurance obligations shall support but shall not in any way limit the defense and indemnity obligations set forth herein.

    **B.**    **Definitions.**

        For the purposes of this Article VIII, the following definitions shall apply:

        **1.**    "Owner Group" shall mean any one or more of: (a) Owner, as described in Article 1 A, herein, its partners and limited partners; (b) the contractors and subcontractors of (a); (c) the agents, directors, officers and employees of (a) and (b); and (d) the heirs, successors and assigns of (a), (b) and (c).

        **2.**    "Charterer Group" shall mean any one or more of: (a) Charterer; its parent, subsidiaries, affiliates, partners and limited partners; (b) the working interest owners, co-lessees, co-owners,-lessors and joint venturers of (a); (c) and, except for Owner Group, the contractors and subcontractors of (a) and (b); (d) the agents, directors, officers and employees of (a), (b) and (c); and (e) the heirs, successors and assigns of (a), (b), (c), and (d).

    **C.**    **Owner To Provide Insurance - Charterer Group Named As Additional Insured.**

**1. In General.** Owner shall maintain, at its own expense, such insurance necessary to protect against all claims for damages, risks, losses, and contractual indemnities covered by this Agreement, specifically including, without limitation, any and all risks and/or claims set forth in Article VIII.D.1, below, and shall secure and maintain policies with the minimum limits and other requirements required by this Agreement and as stated in Schedule "B" attached to and incorporated into this Agreement. All deductibles shall be the responsibility of Owner, and all such policies shall be issued by insurance companies that are solvent and satisfactory to Charterer and that have an AM Best Rating of A-7 or higher or alternatively have been issued by Underwriters at Lloyds or the International Underwriting Association of London. The coverages afforded herein shall be primary in relation to any policies carried by Charterer Group and to any other policies in which Charterer Group may be named as an additional insured but only to the extent of the liabilities assumed by Owner Group in this Agreement. The party signing as Owner guarantees and expressly warrants

EXXI000103

to Charterer that each and every party included in the definition of Owner in Article I. A., and Owner Group under this Article VIII and each and every one of their underwriters, waives all rights of subrogation (whether by loan receipt, equitable assignment or otherwise) which any or all of them may have against Charterer Group and its underwriters but only to the extent of the liabilities assumed by Owner Group in this Agreement. Owner is not required to name Charterer Group as an additional insured and waive rights of subrogation against Charterer Group for those risks and liabilities specifically allocated to Charterer in this Article VIII. It is understood and agreed that Owner is not required to obtain coverage protecting Charterer for those risks specifically allocated to Charterer in Article VIII.D.2. of this Agreement.

2.      **Additional Insured Coverage.**

   (a)     All policies carried by Owner, except for the workers' compensation coverage of the workers' compensation policies, shall name Charterer Group as additional insureds and waive all rights of subrogation against CHARTERER GROUP and its insurers (whether by loan receipt, equitable assignment or otherwise) but only to the extent of the liabilities assumed by Owner Group in this Agreement.

   (b)     Notwithstanding any language in a policy which is aimed at limiting coverage for the named or any insured based upon liability incurred as a result of ownership, operation or control of any Vessel, Charterer Group is to be provided full coverage, whether or not liability is incurred "as owner" of the Vessel, up to the maximum combined limit of each policy, and Owner agrees to amend its policies as necessary to afford Charterer Group such full coverage.

   (c)     Any provision limiting coverage for Charterer Group in the event of applicability of the Limitation of Liability statute shall be deleted.

In any policy of insurance maintained by Owner that has combined limits greater than the minimum limits required above, Charterer Group shall be insured to the full amount of the policy limits.

3.      **Certificates of Insurance.**

   Prior to performing work and/or services and/or to providing the Vessel referred to in any Vessel Charter, Owner shall furnish Charterer Certificates of Insurance on the forms supplied by Charterer and attached to this Agreement as Schedule "C" reflecting insurance coverage in accordance with the requirements of this Agreement and Schedule "B" attached hereto and incorporated herein. Failure of Charterer to object to Owner's failure to furnish such certificates or to object to any defect in such certificates shall not be deemed a waiver of Owner's obligation to furnish such a certificate and to provide insurance coverage as described in this Agreement and in Schedule "B." The minimum insurance requirements provided in Schedule "B" are not intended in any way to limit the extent of Owner's indemnity obligation.

   In the event that Owner fails to perform any of its obligations hereunder with respect to insurance, with or without the knowledge or consent of Charterer, then Owner shall itself be an insurer to the extent it has failed to perform such obligations.

D.      **Indemnities.**

   1.      **Owner's Indemnity Obligations.** Owner shall defend, indemnify, hold harmless, and release

7

EXXI000104

Charterer Group from and against any and all claims, losses, damages, demands, causes of action, suits judgments, and liabilities of every kind (including all expenses of litigation, court costs and reasonable attorneys' fees) brought or asserted against Charterer Group by any party whomsoever, directly or indirectly arising out of or originating from this Agreement, (including any ingress, egress, loading or unloading of cargo or personnel) and resulting from any claim of loss, damages, injury, illness or death described in subparagraphs (a) through (f) below, regardless (except as expressly provided herein) of who may be at fault or otherwise responsible under any other contract, or any statute, rule or theory of law, including but not limited to theories of strict liability, and even though the subject loss, damage, injury, illness or death may have been caused in whole or in part by: (1) the sole, concurrent, active, or passive negligence, of Charterer Group or a third party; (2) the unseaworthiness of any vessel chartered by or on behalf of Charterer Group or any other person or entity; or (3) a defect in the property or equipment of Charterer Group or any other person or entity or in any vessel provided by or on behalf of Charterer Group or any other person or entity, including but not limited to those defects pre-existing the effective date of this Agreement.

(a)        Personal injury to, bodily injury to, emotional or psychological injury to, or illness or death of employees of Owner Group (including, without limitation, all costs and expense associated with the medical evacuation of and/or emergency medical service provided to such employees), no matter where or how the injury, illness or death occurs, even if Owner Group is protected from direct suit by the Longshoremen's and Harbor Worker's Compensation Act of the United States or by any state workers' compensation laws.

(b)    Damage to, loss, or loss of use of any Vessel or any other property of Owner Group.

(c)  Except as provided for in Article VIII(D)(2)(b) hereinbelow, loss of, damage to, or loss of use of docks, berths, bridges, wharves, shore facilities and installations, pipelines, other vessels, boats, ships, barges or other watercraft and their cargoes, drilling or production vessels, rigs, platforms or equipment thereon and appurtenances thereof, and navigation aids that may in any way be caused, in whole or in part, by the unseaworthiness of any Vessel or the sole, concurrent, active or passive negligence, fault or strict liability of Owner Group.

(d)  Liability, costs, expense, penalties or fines incident to the removal and/or marking of the wreckage and/or debris of the following when legally required or when reasonably demanded by Charterer:

    (i)      any property, equipment, or vessels owned, leased, chartered to or by or provided by Owner Group, including but not limited to any Vessel; and

    (ii) any of Charterer's property or cargo and/or any other property or cargo aboard the Vessel if such wreckage or debris results, in whole or in part, from the unseaworthiness of any Vessel or the sole, concurrent, active or passive negligence, fault or strict liability of Owner Group.

(e)  Liabilities, costs, expenses, penalties and/or fines (including costs of control and removal) arising from or caused by any pollution from any property, equipment, or Vessel owned, leased or provided by Owner Group, including costs of cleanup of same.

EXXI000105

(e) Any claim for damages, discrimination, harassment or loss by personnel furnished by Owner Group or any of their suppliers, arising out of or in connection with any work performed or to be performed by Owner hereunder, as well as any such claims arising out of or in connection with the presence of personnel furnished by Owner Group or any of their suppliers.

2.     Charterer's Indemnity Obligations. Charterer shall defend, indemnify, hold harmless, and release Owner Group from and against any and all claims, losses, damages, demands, causes of action, suits, judgments, and liabilities of every kind (including all expenses of litigation, court costs and reasonable attorneys' fees) brought or asserted against Owner Group by any party whomsoever, directly or indirectly arising out of or originating from this Agreement, (including any ingress, egress, loading or unloading of cargo or personnel) and resulting from any claim of loss, damages, injury, illness or death described in subparagraphs (a) through (d) below, regardless (except as expressly provided herein) of who may be at fault or otherwise responsible under any other contract, or any statute, rule or theory of law, including but not limited to theories of strict liability, and even though the subject loss, damages, injury, illness or death may have been caused, in whole or in part, by: (1) the sole, concurrent, active or passive negligence, of Owner Group or any other person or entity; (2) the unseaworthiness of any vessel chartered by or on behalf of Owner Group or a third party; or (3) a defect in the property or equipment of Owner Group or any other person or entity, or in any vessel provided by or on behalf of Owner Group or any other person or entity, including but not limited to those defects pre-existing the effective date of this Agreement.

    (a)   Personal injury to, bodily injury to, emotional or psychological injury to, or illness or death of employees of Charterer Group (including, without limitation, all costs and expenses associated with medical
evacuation of and/or emergency medical services provided to such employees), even though Charterer may be protected from direct suit by the Longshoremen's and Harbor Workers' Compensation Act of the United Stated or by any state workers' compensation laws.

    (b)   Damages to, loss of, or loss of use of Charterer Group's property or cargo aboard the Vessel and/or any other property or cargo aboard the Vessel.

    (c)   Liabilities, costs, expense, penalties and/or fines (including costs of control and removal) arising from or caused by any pollution from any property or equipment owned, leased or provided by Charterer Group, including costs of cleanup of same.

    (d)   Any claim for damages, discrimination, harassment or loss by personnel furnished by Charterer Group or any of their suppliers, arising out of or in connection with any work performed or to be performed by Owner hereunder, as well as any such claims arising out of or in connection with the presence of personnel furnished by Charter Group or any of their suppliers.

3.     Indemnity Related Obligations.

    (a) The insurance, indemnity and defense obligations in this Agreement are separate obligations, and the validity or enforceability of any of the foregoing is not intended to be dependent upon the validity or enforceability of any other of the foregoing. To the fullest extent permitted by law, it is the intent of Owner and Charterer that the insurance requirements, the indemnifications and the defense and other obligations shall be separately construed to be valid and enforceable. The invalidity, or unenforceability in whole or in part, of any provision of this Agreement is not intended to affect the validity or enforceability of any other provision of this Agreement. Any provision

9

which might otherwise be invalid or unenforceable shall, to the fullest extent permitted by law, be deemed to be amended to the extent necessary for that provision to be valid and enforceable to the fullest extent permitted by law.

(b)      Without relieving Owner of any of its indemnity obligations, Charterer may take part in any degree it deems necessary in the control and removal of any pollution or contamination which is the responsibility of Owner under the foregoing provisions. Owner shall reimburse Charterer for all these costs to the extent that such risk is allocated to Owner herein.

(c)      During the term of this Agreement and/or any Vessel Charter bound in accordance herewith, Owner and/or any of its agents, or representatives and/or any of the employees of Owner may have occasion to be upon or about vessels, equipment or premises belonging to or under the control of or in the possession of Charterer while performing services for another company, and/or while in transit between a Vessel and another location. In such event, Owner's obligations under Article VIII shall apply to the same extent as if Owner had been employed at the direction of or for the direct benefit or account of Charterer.

### E.   Defense Obligations.

1.      Regardless of the enforceability of any of the foregoing insurance and indemnity obligations, the parties shall owe each other a separate duty to investigate, handle, respond to and provide defense for any claim, demand or suit for which it owes indemnity under this Agreement, and shall satisfy any and all judgments or decrees which may be entered. A party that owes this duty shall be called the "defending party." A party to whom this duty is owed shall be called the "indemnified party."

2.      The duty of defense shall require the defending party to retain counsel of defending party's choice at defending party's sole cost and expense to represent the indemnified party.

3.      If for any reason the defending party does not provide the insurance, indemnity or defense required by this Agreement, or only partially or conditionally accepts such obligations, then the duty of defense shall extend to and include payment of the indemnified party's attorneys' fees, costs and expenses of defense and any attorneys' fees, costs and expenses associated with recovery of the indemnified party's claims for defense, insurance or indemnity.

4.      The indemnified party shall notify the defending party within a reasonable period of time of any facts which might give rise to a claim, demand or suit for which a defense will be required regardless of whether or not the claim, demand or suit has been made or filed.

5.      If a tender of defense and indemnity is fully and unconditionally accepted by the defending party, the indemnified party shall:

(a)      Afford the defending party a reasonable opportunity to investigate the facts relating to the claim, demand, or suit, including, but not limited to, interviewing witnesses, inspecting property and reviewing documents; and

(b)      Cooperate at all times with the defending party's effort to prepare the case, including but not limited to timely responding to interrogatories and document requests, making witnesses available for

EXXI000107

depositions and attending trial of the case.

6.     If a tender of defense and indemnity is made by the indemnified party but rejected, or only partially or conditionally accepted, by the defending party, the indemnified party may elect to defend itself and upon a determination that the defending party owed a duty of defense and indemnity under this Agreement, the defending party shall, in addition to all other obligations owed under this Agreement, be liable for any amount reasonably paid by the indemnified party in settling the claim.

7.     Owner agrees to allow any member of Charterer Group at any time to participate in the defense of any claim or suit by retaining its own counsel at its own expense to enter its appearance and prepare its defense regardless of any defense obligations that Owner might otherwise have.

8.     The parties agree that the foregoing duty of defense, or the obligation to reimburse defense costs, shall be owed whether or not the party to whom the duty is owed is ultimately determined to be solely, concurrently, actively or passively negligent, strictly liable or otherwise at fault.

9.   OWNER AGREES THAT EXCLUSIVE VENUE FOR THE RESOLUTION OF ANY DISPUTE WITH CHARTERER HEREUNDER SHALL BE THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION UNDER RULE 9(h) OF THE FEDERAL RULES OF CIVIL PROCEDURE.

IX.   REPORTS OF ACCIDENTS.

A. Owner shall report to the Charterer representative as soon as practicable all accidents and/or occurrences resulting in injuries to Owner group's employees or third parties, spills or releases of pollutants and/or contaminants, or damage to property arising out of or during the course of the services performed by Owner group under this Agreement and/or any Vessel Charter.

B. Owner shall furnish Charterer with a copy of any reports made by Owner group of such accidents or occurrences. Owner shall also prepare and make available all reports of accidents or occurrences resulting in spills or releases of pollutants or contaminants which maybe required by federal, state, or local laws, orders or regulations, including but not limited to the Oil Pollution Act, the United States Water Quality Improvement Act of 1970, the Clean Water Act of 1972, the Act to Prevent Pollution from Ships, and the Outer Continental Shelf Lands Act of 1953, and any and all amendments thereto.

X.   <u>DOWNTIME.</u>

Should any Vessel break down or become inoperative or unable to operate at full capacity for any reason other than the sole negligence of Charterer, or should the use of such Vessel for the purposes contemplated by Charterer be restricted or denied for any cause, and should such condition continue for as long as twelve (12) consecutive hours, the daily charter rate specified in the applicable Vessel Charter shall cease for the time such condition continues in excess of such twelve hour (12) hour period. Necessary repairs shall be made at such times as will least interfere with Charterer's operations.

Subject to the foregoing, Charterer agrees that Owner shall be allowed up to twelve (12) working days per twelve (12) month period as downtime for all dry docking and/or actual repair or maintenance, during which downtime period the daily charter rate specified in the applicable Vessel Charter shall continue to be paid. Such downtime shall accrue at the rate of one (1) day per thirty (30) day period commencing on the date of delivery

11

EXXI000108

specified in the applicable Vessel Charter (hereinafter referred to as the "Charter Date"), and shall accrue on the last day of such thirty (30) day period, during the term of the particular Vessel Charter; provided, however, that the twelfth (12th) day of downtime may be used at any time during the twelfth (12th) month. The twelve (12) hour period referred to in the preceding paragraph shall in each instance be charged against accrued downtime; in the event such twelve (12) hour period, or any part thereof, exceeds accrued downtime then Charter hire shall cease at that time. Any downtime not utilized within a particular twelve (12) month period shall not be applied to any succeeding twelve (12) month period. Each such twelve (12) mouth period shall commence on the Charter Date and/or the annual anniversary of such Charter Date.

## XI.   TAXES.

Owner shall be responsible for and pay all local, state, federal and foreign property taxes on the Vessel. Charterer shall be responsible for any domestic or foreign transportation, use, sales or similar taxes arising in connection with the authorized operation and use of the Vessel du'ing the term of a particular Vessel Charter, provided that:

A. If Owner has received notice of an assessment, proposed assessment, tax charge, lien or other tax indebtedness, such notice must be promptly forwarded to Charterer in a manner which shall preserve for Charterer all rights to protest said tax, with or without payment thereof, in the same manner and scope as if said tax were being challenged or protested by Owner;

If Charterer desires that Owner protest, contest or challenge any tax for which Charterer might be liable, Owner shall, at Charterer's expense, pursue such protest, contest or challenge as directed by Charterer. Charterer shall not be responsible for any transportation, use, sales or similar taxes arising in connection with the operation and use of the Vessel if such taxes are imposed by the taxing authority solely because of activities of the Owner or the Vessel unrelated to the charter of the Vessel pursuant to this Agreement and/or any Vessel Charter.

## XII.   EQUAL EMPLOYMENT. SAFETY. AND HEALTH REQUIREMENTS.

Charterer has established certain safety rules and regulations and expects not only that its own employees shall abide by such rules and regulations, but requires that its contractors and their employees and any other persons having occasion to be upon or about the property of Charterer comply with such rules and regulations as well. These rules include, but are not limited to, those attached as Schedules "D," and "E", and all of which are fully incorporated herein. In order to effectuate these safety goals, Owner agrees as follows:

1.     The party signing as Owner warrants that Owner shall comply with all applicable local, state and federal safety rules and regulations. These rules and regulations include, but are not limited to, regulations of the United States Coast Guard and the United States Minerals Management Service. Further, in the event that any employees of Owner shall have occasion to be upon or about vessels, equipment or premises belonging to or under the control of or in the possession of Charterer, they shall comply with Charterer's existing posted Company Safety Rules including, without limitation, Charterer's safety rules relating to the prevention of drug and alcohol abuse, and changes in those rules as they may be made from time to time in the future.

2.     Owner shall make a planned, continuing effort to eliminate accidents due to human error. This effort shall include the training of personnel in operational aspects of their

12

EXXI000109

functions and the establishment of a program to instill in each of the employees of Owner a conscious desire to conduct safe and pollution free operations. Owner shall establish and continue to maintain a training program in compliance with all applicable local, state and federal laws, rules and regulations. Owner represents that all of the employees of Owner have satisfactorily completed a safety course meeting the requirements of this paragraph and that each of such persons understands all of Charterer's safety rules and emergency procedures, as well as all other applicable laws and regulations relating to safety. Owner warrants that each of such persons has received or shall receive immediately upon arrival sufficient training to be able to utilize and operate properly all safety equipment. Owner also warrants that it has trained each of such persons to perform his assigned work in a safe and competent manner so that such person's actions do not endanger himself or others.

3. In the event that the employees of Owner have occasion to be upon or about the property or equipment of Charterer, such persons shall immediately familiarize themselves with any posted safety rules of Charterer, emergency procedures and other safety requirements.

## XIII.   EQUIPMENT INSTALLED BY CHARTERER ON VESSEL.

Charterer may, at Charterer's expense, install on any Vessel chartered pursuant to this Agreement, such additional gear or equipment as Charterer may deem pertinent with respect to the use to which such Vessel is to be put, to wit: carrying oil field equipment, materials and personnel in connection with the exploration for and production of oil, gas, and other minerals by Charterer; provided, however, that Charterer shall make no structural modifications to any Vessel chartered in accordance herewith unless Charterer has first obtained Owner's written authorization to do so. Owner and the master of the Vessel shall have sole responsibility for directing where such gear or equipment may be safely installed aboard the Vessel. All such gear and equipment installed by Charterer shall remain the property of Charterer and maybe removed by Charterer at any time during the term of the particular Vessel Charter. All such gear and equipment shall be removed by Charterer if requested by Owner immediately upon the conclusion of the particular Vessel Charter.

## XIV.   LIMITATION OF LIABILITY.

Nothing in this Agreement or in any Vessel Charter bound in accordance herewith shall be construed or held to deprive Owner or Charterer or the Vessel of any right to claim, as against any third party, limitation of liability provided by any presently existing statute of the United States or any statute of the United States which may hereafter be enacted.

## XV.   ASSIGNMENT AND SUBCHARTER.

Charterer shall have the right to subcharter or assign this Agreement and/or any Vessel Charter, without prejudice to the rights of Owner or Charterer. Owner's rights and obligations under this Agreement are not transferable without the written consent of Charterer, which will not be unreasonably withheld. In the event the Vessel is sold without Charterer's consent, Charterer may, in addition to any other remedies which may be available to Charterer in law, equity or admiralty, terminate the particular Vessel Charter, whereupon Owner shall reimburse Charterer for any unearned charter hire.

Notwithstanding the language in the preceding paragraph, Owner may assign to a third party any accounts receivable under this Agreement and/or any Vessel Charter without the written consent of Charterer if

EXXI000110

Owner seasonably furnishes Charterer with documentation which reasonably establishes that the assignment has been made and which reasonably identifies the rights assigned. Owner understands and acknowledges that Charterer's internal procedures for the payment of invoices have been designed in such a manner that invoices may be promptly paid in accordance with the requirements of Article IV of this Agreement. In order to ensure that such assigned accounts receivable may be paid by Charterer promptly, to the correct payee, and in a manner which will protect the interests of all concerned, Owner and Charterer hereby agree that a notification of any assignment of accounts receivable does not reasonably identify the rights assigned unless: (a) the notification conspicuously appears on the face of each invoice presented by Owner and/or its assignee to Charterer for payment; (b) the notification directs that payment of the invoice be made by check or other instrument which is payable jointly to Owner and Owner's creditor, as assignee; and (c) the notification specifies the address at which such invoice should he paid.

## XVI.   RECORDS.

Owner shall maintain an accurate record of work performed, including but not limited to a master's log, fuel recap sheet, and fuel transfer tickets. Owner shall furnish such record to Charterer as maybe requested by Chatterer, and Owner shall retain such record for a period of five (5) years following the expiration of the term of the applicable Vessel Charter. Owner shall not pay any commissions or fees or grant any rebates to any employee or officer of Charterer.

Owner shall maintain a complete and correct set of records and logs pertaining to all aspects of this Agreement and all particular Vessel Charters, including the performance hereof by Owner. Charterer shall have the right, at Charterer's sole expense, to inspect and audit any and all such records relating in any manner thereto, at anytime and from time to time, while this Agreement and/or any Vessel Charter under this Agreement remains in effect and for a period of five (5) years after the termination or expiration of this Agreement or of the particular Vessel Charter to which the questioned invoices relate. It is agreed that payment by Charterer of any invoice shall not constitute a waiver of Charterer's right subsequently to contest the amount or correctness of said invoice and to seek reimbursement. In the event of any dispute, Charterer may withhold payment of the disputed amount or Charterer may pay the disputed amount without waiver of any of its rights, including the right to seek reimbursement. Owner agrees to not encumber or allow its contractors or subcontractors to encumber Charterer's property.

## XVII.   INSPECTION.

Charterer shall have the right to board the Vessel and inspect the operations of the Vessel at any time during the term of the particular Vessel Charter.

## XVIII. DEVIATION.

Subject to Owner obtaining Charterer's approval, the Vessel may engage in salvage services, provided, however, such deviation does not jeopardize the safety of Charterer's equipment, personnel or operations of Charterer, including without limitation continuous drilling operations of Charterer. All proceeds of any salvage and/or salvage towage, after payment of out-of-pocket expenses and awards to the master and crew, shall be divided equally between Owner and Charterer. In the alternative, at Charterer's sole discretion, Charterer may at any time require Owner to suspend hire on the Vessel during the time used for any salvage operation. All salvage and salvage towage shall, after payment of out-of-pocket expenses, awards to the master and crew, and charter hire due Owner during salvage efforts, be divided fifty percent (50%) to Charterer and fifty percent (50%) to Owner.

EXXI000111

## XIX.   NOTICES.

The addresses of Owner and Charterer for sending of notice under this Agreement and any Vessel Charter shall be those stated in the preamble to this Agreement.

## XX.   APPLICABLE LAW.AND VENUE

It is the desire and intention of Owner and Charterer to provide that the General Maritime Law of the United States shall in all instances govern the interpretation of this Agreement and the rights and obligations of Owner and Charterer under this Agreement, any amendments hereto, and any Vessel Charter, without regard, however, to any choice of laws or conflicts of laws provisions which would direct the application of the laws of another jurisdiction. Any dispute which arises from or is related to this Agreement shall be resolved by litigation only in the United States District Court for the Southern District of Texas, Houston Division, under Rule 9 (h) of the Federal Rules of Civil Procedure.

## XXI.   FORCE MAJEURE.

Except for the duty to make payments as provided in Article IV and subject to Article VIII, neither Owner nor Charterer shall be liable for, or responsible to the other for, any delay, damages or failure due to Force Majeure. The term "Force Majeure" as used in this Agreement shall mean an act of God, strike, act of the public enemy, war, mines or other items of ordnance, blockage, public riot, fire, explosion, blowout, inability to obtain permits, servitude or rights-of-way, and any laws, orders, rules, regulations, acts or restraints of any governmental authority, and any other cause, whether of the kinds specifically enumerated above or otherwise, which is not reasonably within the control of Charterer or Owner.

Performance by either Charterer or Owner shall be excused if, for so long as, and to the extent the same is prevented or delayed by Force Majeure, provided that the party whose performance is prevented or delayed has taken all reasonable steps to prevent or avoid the occurrence of the Force Majeure event, promptly gives notice to the other of the inception and cessation of such prevention or delay, and promptly takes all reasonable steps to eliminate and/or reduce such cause so that performance hereunder may be resumed.

After thirty (30) consecutive or nonconsecutive days of suspension of Owner's or Charterer's performance because of force majeure, Charterer shall have the option to cancel this Agreement and/or any Vessel Charter on twenty four (24) hours notice and Charterer shall thereafter have no obligation to pay, or liability for, charter hire for the balance of the charter term.

## XXII.   ENTIRE AGREEMENT.

This Agreement, together with any and all Schedules attached hereto and any Vessel Charters, supersedes all other agreements, oral or written, heretofore made with respect to the subject matter hereof and the transactions contemplated hereby, and it contains the entire agreement of Owner and Charterer. In the event of a conflict between the body of this Agreement and any of the attached Schedules or any Vessel Charters, the provisions in the body of this Agreement shall prevail. This Agreement, including the attached Schedules and any Vessel Charters, shall not be amended or modified except in writing signed by authorized representatives of both Owner and Charterer. It is expressly agreed that this Agreement and any Vessel Charters shall not be construed against any party on the basis of who drafted this Agreement or any Vessel Charters or who supplied the

15

EXXI000112

form of the Agreement or any Vessel Charters. Each party agrees that the Agreement and any Vessel Charters have been purposefully drawn and correctly reflect their understanding of the transactions that the parties contemplate.

## XXIII.  SEVERABILITY.

Should any provision of this Agreement or any Vessel Charter be judicially declared invalid, unenforceable or void, such declaration shall not have the effect of invalidating or voiding the remainder of this Agreement or any Vessel Charter, and Owner and Charterer agree that the part or parts of this Agreement or Vessel Charter so held to be invalid, unenforceable or void shall be deemed to have been stricken therefrom, and the remainder shall have the same force and effect as if such part or parts had never been included therein.

## XXII.  RELEASE OF INFORMATION.

Should Owner desire to publish or release, for public relations purposes, any material or information relating to this Agreement or to any Vessel Charter, Owner shall first submit such material or information to Charterer for its review and approval.

## XXV.  WAIVER.

No benefit or right accruing to either Owner or Charterer under this Agreement or any Vessel Charter shall be deemed to be waived unless the waiver is reduced to writing, expressly refers to this Agreement, and is signed by both Owner and Charterer. The waiver, in any one or more instance(s), of any act, condition or requirement stipulated in this Agreement or in any Vessel Charter shall not constitute a continuing waiver or a waiver of any other act, condition or requirement or a waiver of the same act, condition or requirement in other instances, unless specifically so stated in such written agreement.


**IN SIGNING THIS AGREEMENT, OWNER EXPRESSLY ACKNOWLEDGES THAT IT IS AWARE OF ITS RIGHT TO OBTAIN LEGAL COUNSEL TO REVIEW THIS AGREEMENT. FURTHERMORE, OWNER EXPRESSLY ACKNOWLEDGES THAT IT HAS READ AND UNDERSTANDS ALL OF THE PROVISIONS CONTAINED IN THIS AGREEMENT, INCLUDING THE INDEMNITY PROVISIONS CONTAINED IN ARTICLE VIII WHICH MAY REQUIRE OWNER TO INDEMNIFY CHARTERER REGARDLESS OF CHARTERER'S SOLE, PASSIVE, ACTIVE OR CONCURRENT NEGLIGENCE AND REGARDLESS OF WHETHER CHARTERER MAY BE HELD LIABLE UNDER ANY LEGAL THEORY, INCLUDING STRICT LIABILITY. OWNER FURTHER ACKNOWLEDGES THAT IT HAS READ AND UNDERSTANDS ALL THE ATTACHMENTS TO THIS AGREEMENT. AFTER READING THIS AGREEMENT IN ITS ENTIRETY, OWNER AGREES TO ALL PROVISIONS OF THE AGREEMENT AS INDICATED BY HE SIGNATURE OF ITS AUTHORIZED REPRESENTATIVE BELOW.**

Owner:                                          Charterer: Energy XXI Services, LLC

By: _Burr Bartholomy_                By: _____
Name: _Brian Bartholomy_         Name: _Steve Nelson_
Title: _Operations Manager_       Title: _VP Drilling + Prod._

16

EXXI000113

Attachments:

1. Schedule "A"        Vessel Charter - Sample
2. Schedule "B"        Minimum Insurance Requirements
3. Schedule "C"        Charterer's certificate of insurance
4. Schedule "D"        Equal Employment Compliance Certificate
5. Schedule "E"        Contraband Control Policy

17

EXXI000114

**SCHEDULE"A"VESSEL CHARTER**

**TO:**_____

**Re:**    Time charter of M/V

**Gentlemen:**


     Pursuant to the terms and conditions of that certain Master Time Charter executed by the undersigned Owner and Energy XXI Services, LLC on the _____ day of_____ , _____ , this letter sets forth our understanding and agreement that the M/V_____, Official Number _____ , shall be chartered to you, subject to the following:

1.    Date of Delivery:_____
2.    Location of Delivery:_____
3.    Location of Redelivery:_____
4.    Area of Operations/Navigation Limits:_____
5    Minimum Term of Charter:_____
6.    Daily Charter Rate:_____
7    Meals and Lodging Rates for Non-Crewmembers:_____
8.    Agreed Value of Vessel:_____
9.    Special Provisions:_____

**Please date and sign the duplicate copy of this letter in acceptance of the foregoing and rerun it to us.**

                             **Owner:**

                             **By:** _____

                             **Title:** _____

                             **Date:** _____

AGREED TO AND ACCEPTED ON THE
_____ DAY OF _____, _____

**Energy XXI Services, LLC**

**By:** _____

**Title:**_____

**Date:**  _____

EXXI000115

<u>SCHEDULE"B</u>

<u>INSURANCE REQUIREMENTS FOR ALL
CONTRACTORS AND THIRD PARTY SERVICES</u>

Every Contractor furnishing services must give ENERGY XXI evidence of the following listed minimum insurance coverages, limits and amounts:

<u>Worker's Compensation Insurance</u>  Statutory Workers' Compensation for State of Hire and State of Operation and including, Other States Insurance, Voluntary Compensation, Alternate Employer/Borrowed Servant, Outer Continental Shelf Lands Act, Gulf of Mexico Territorial Extension and In Rem.

<u>Employer's Liability Insurance</u>
1,000,000 Bodily Injury by Accident - Each Accident
1,000,000 Bodily Injury by Disease - Policy Limit
1,000,000 Bodily Injury by Disease - Each Employee

In addition, Offshore Contractors must have the following coverage:

<u>Maritime Employers Liability Insurance</u>  $1,000,000 per accident or occurrence. Maritime operations policy shall be endorsed specifically to include the following coverages: U.S. Longshoreman's and Harbor Workers' Compensation, including the Outer Continental Shelf Lands Act, full maritime endorsement, including Jones Act, Unseaworthiness, Death on the High Seas Act, and the General Maritime Laws for all employees including coverage for transportation, wages, maintenance, and cure. Also, coverage should be amended to provide for Voluntary Compensation Endorsement, In Rem Endorsement, Borrowed Servant Endorsement, Alternate Employer Endorsement, and All States Endorsement.

<u>Comprehensive General Liability</u>  . $ 1,000,000 per occurrence and 52,000,000 in the aggregate For Bodily Injury and Property Damage combined single limit. Such policy written on an occurrence coverage form such as ISO CG 00 001 or equivalent and shall be endorsed specifically to include the following coverages: Property damage arising from blowout and cratering, explosion, collapse or underground damage, products and completed operations for at least two years after completion of work, Sudden and Accidental Seepage, Pollution and Contamination Coverage (including bodily injury, property damage, control, monitoring and cleanup costs), Premises Operations, Personal and Advertising Injury, Contractual Liability, Contractor's Protective Liability, Care, Custody and Control exclusion eliminated, or in lieu of that, Broad Form Property Damage endorsement.

In addition to the above endorsements, maritime operations must have the following endorsements: Watercraft Exclusion eliminated, In Rem Endorsement, Coverage for diving operations (if diving operations are to be performed hereunder), and Extension of Territorial Limits Endorsement for Gulf of Mexico operations. Where applicable, coverage shall be provided for liability resulting from consumption of food prepared by or served by contractors.

<u>Comprehensive Automobile Liability</u> $1.000.000 bodily injury and/or property damage combined single limit, per occurrence and in the aggregate. Such policy shall be endorsed specifically to include owned, hired, and non-owned vehicles.

<u>Hull and Machinery Insurance</u>  Such policy shall be sufficient to cover full market value of each vessel owned or boat owned by Contractor in connection with the operations under this Contract, and with navigational limits adequate for Owner to perform the work and services hereunder. If any vessel shall engage in towing operations, said insurance shall include full Towers Liability with the Sistership Clause unamended. Any language in this policy which limits coverage to an insured who is not an owner or who is not entitled to limitation of liability shall be deleted.

EXXI000116

F.   **Protection and Indemnity Insurance**  Such coverage shall be on Form SP-23 or its equivalent and at least be equal to the value of each vessel owned or chartered (including Towers Liability where applicable) and Excess Protection and Indemnity and Towers Liability with a combined limit of not less than $1 million per occurrence. Such insurance shall include coverage for the vessel crew unless it is provided under Paragraph B above. Such insurance shall also be endorsed specifically to include the collision liability (unless covered under the Hull Policy) and coverage for diving operations (if diving operations are to be performed hereunder). Such policy to include wreck removal on compulsory or contractual basis unless covered in the policy required in Paragraph D. If not covered in either policy, then a separate policy must be obtained for wreck removal liability.  Any language in this policy which limits coverage to an insured who is not an owner or who is not entitled to limitation of liability shall be deleted.

G.   **Vessel Pollution Liability**  Such coverage should be on the Water Quality Insurance Syndicate form, or equivalent. Coverage limit should be not less than $5,000,000. Policy should contain coverage for Oil Pollution Act 1990 and Hazardous Substances (CERCLA).

H.   **Aircraft Liability Insurance**  In any operations requiring the use of aircraft and/or helicopters (unless provided by ENERGY XXI) combined single limit insurance shall be maintained for public liability, passenger liability and property damage liability in an amount of not less than $25,000,000.00 or $4,000,000 per seat, whichever is greater with no sublimits for passenger liability; this insurance shall cover all owned and non-owned aircraft, including helicopters, used by Contractor in connection with the performance of any work under this Contract.

I.   **Umbrella Liability**  $25,000,000 combined single limit in excess of all underlying policies. Such umbrella liability coverage shall be in excess of items B, C, D, F, and G above, and including all coverages which are included in the underlying insurances.

NOTE: AS TO ALL THE ABOVE POLICIES, IN THOSE CASES WHERE A CONTRACTOR DOES NOT HAVE THE ABOVE LIMITS PROVIDED BY THE REQUIRED POLICIES, BUT DOES HAVE UMBRELLA COVERAGE OR EXCESS COVERAGE, THEN THE COMBINED PRIMARY AND EXCESS COVERAGE MUST EQUAL OR EXCEED THE ABOVE REQUIRED LIMITS.

In addition to the above:

1.   All insurance coverages required as herein set forth shall be at the sole cost and expense of Contractor, and all deductibles shall be assumed by, for the account of, and at Contractor's sole risk.

2.   All insurance policies shall contain the provision that the insurance companies endorse their policies to provide a waiver of subrogation in favor of ENERGY XXI Services, LLC, its parent, subsidiaries, joint ventures, agents, servants, invitees, employees, officers, directors, co-lessees and affiliated companies . In addition to the coverage listed herein, this waiver must be added by endorsement to all floaters or policies covering Contractor's property used to perform work under a contract with ENERGY XXI.

3.   All policies shall contain a specific endorsement naming ENERGY XXI Services, LLC, its parent, subsidiaries, joint ventures, agents, servants, invitees, employees, officers, directors, co-lessees and affiliated companies. The coverage afforded ENERGY XXI shall be primary as to any other insurance carried by ENERGY XXI its co-lessees or joint venturers, notwithstanding any "other insurance" clause(s) contained in Contractor's or any ENERGY XXI, its co-lessees or joint venturers respective policies, but only to the extent of the liabilities assumed by Owner Group in this Agreement.

4.   All policies shall contain a provision that no cancellation or material change in the policies shall become effective except upon thirty (30) days written notice thereof to ENERGY XXI at 1021 Main Street, Suite 2626, Houston, Texas 77002; Attention West Griffin.

5.   All policies shall contain adequate territorial and navigation limits in order to cover the work to be performed by Contractor for ENERGY XXI.

6.   The requirement by ENERGY XXI that all Third Party Contractors and equipment owners and operators furnish certificates of insurance as evidence of certain minimum insurance coverages and policy amounts shall not be interpreted as in any way limiting the liability of any party who may contract or charter with ENERGY XXI, nor insurance coverages, assume or intend to assume, any liability that it would not otherwise have in the absence of such requirements.

EXXI000117

SCHEDULE «C

**ENERGY XXI SERVICES, LLC**
**1021 Main Street, Suite 2606**
Houston, Texas 77002
**CERTIFICATE OF INSURANCE**

This is to certify that the following insurance policies are in full force and effect.

Name of Insured      _____

Address of Insured   _____

_____

1. Is Energy XXI Services LLC, it's parent, subsidiaries and affiliates included as an Additional Insured on all policies (except Workmen's Compensation?    □ YES □ NO

2. Do all policies contain waiver of subrogation in favor Energy XXI Services, LLC, its parent, subsidiaries and affiliates?    □ YES □ NO

3. Are all policies endorsed to be primary coverage to the Additional Insured in relation to any policies carried by Energy XXI itself?    □ YES □ NO

4. Do policies provide for 30 days written notice of cancellation or material change?    □ YES □ NO

5. Do policies provide adequate territorial and navigation limits?    □ YES □ NO

| COVERAGE | LIMITS OF LIABILITY | POLICY NO. & COMPANY | POLICY PERIOD |
|---|---|---|---|

**A.   Workmen's Compensation**   Statutory

Employer's Liability     $_____ per /$_____ /$_____
Maritime Liability       $_____ per accident
                                    or occurrence

**B.   Comprehensive General Liability**

Bodily Injury       $_____ per occurrence
                    $_____ aggregate
Property Damage     $_____ per occurrence
                    $_____ aggregate
or

Combined Single Limit   $_____ per occurrence
                        $_____ aggregate

21

EXXI000118

**C.**          **Comprehensive Automobile Liability**

        Bodily Injury               $_____per person
                                    $_____ per occurrence
        Property Damage        $_____per occurrence

        Combined Single Limit   $_____

**D.**   **Hull and Machinery**     $_____

**E.**     **Protection and Indemnity**   $_____

**F.**   **Aircraft Liability**      $_____      Combined Single Limit including passenger liability

**G.**   **Umbrella Form**       $_____
        **Excess Liability Form**    $_____

**H.**   **Other**              $_____

**I.**    **Other**              $_____

Please answer the following questions regarding the policies listed above.

**A.**   **Workmen's Compensation, Employers' Liability, Maritime Employers Liability**

**I.**     Does this policy contain:

| | | | |
|---|---|---|---|
| (a) | U.S. Longshoremen's and Harbor Workers' Compensation Endorsement? | ☐ YES | ☐ NO |
| (b) | Outer Continental Shelf Act Endorsement? | ☐ YES | ☐ NO |
| (c) | Voluntary Compensation Endorsement? | ☐ YES | ☐ NO |
| (d) | Maritime Employer Liability | ☐ YES | ☐ NO |
| | (1) Is coverage afforded for transportation, wages, maintenance and cure? | ☐ YES | ☐ NO |
| | (2) Limits of Liability - $1,000,000 per MSA | | |
| (e) | Employers Liability | ☐ YES | ☐ NO |
| | Limits of Liability $1,000,000/$ 1,000,000/51,000,000 per MSA | | |
| (f) | Provision that a claim "in rem" be treated as a claim "in personam"? | ☐ YES | ☐ NO |
| (g) | "Borrowed Servant" Endorsement? | ☐ YES | ☐ NO |
| (h) | All States" Endorsement? | ☐ YES | ☐ NO |

EXXI000119

|  | (i) | "Alternate Employer" Endorsement? | ☐ YES | ☐ NO |
|---|---|---|---|---|

**B.** **Comprehensive General Liability**

| | 1. | Is policy on an "occurrence" basis | ☐ YES | ☐ NO |
|---|---|---|---|---|
| | 2. | Does policy provide Contractors Protective Liability for work sublet? | ☐ YES | ☐ NO |
| | 3. | If insured has contract with ENERGY XXI Services LLC or its parent, subsidiaries or affiliates does it contain "hold harmless" agreement, and does policy cover such assumed contractual liability? | ☐ YES | ☐ NO |
| | 4. | Does policy cover: | | |
| | | (a) Surface damage from blowout and cratering? | ☐ YES | ☐ NO |
| | | (b) Damage arising from explosion, collapse or underground property damage hazards? | ☐ YES | ☐ NO |
| | 5. | Does policy cover owned and non-owned watercraft away from Insured's premises? | ☐ YES | ☐ NO |
| | 6. | Does policy provide that a claim "in rem" shall be treated as a claim "in personam"? | ☐ YES | ☐ NO |
| | 7. | Is watercraft exclusion removed from Contractual Liability Coverage? | ☐ YES | ☐ NO |

**C.** **Comprehensive Automobile Liability**

| | 1. | Does policy cover all owned, non-owned and hired automobiles? | ☐ YES | ☐ NO |
|---|---|---|---|---|

**D.** **Hull and Machinery**

| | 1. | Does vessel engage in towing? | ☐ YES | ☐ NO |
|---|---|---|---|---|
| | 2. | Is Towers Liability provided with Sistership clause unamended? | ☐ YES | ☐ NO |
| | 3. | Are all limitation clauses removed as respects interest of ENERGY XXI | ☐ YES | ☐ NO |

**E.** **Protection and Indemnity**

| | 1. | Does vessel engage in towing? | ☐ YES | ☐ NO |
|---|---|---|---|---|
| | 2. | Is Towers Liability provided with sistership clause unamended? | ☐ YES | ☐ NO |
| | 3. | Are all limitation clauses removed as respects interest of ENERGY XXI? | ☐ YES | ☐ NO |
| | 4. | Is removal of wreck coverage provided? | ☐ YES | ☐ NO |
| | 5. | Is Collision Liability Provided ? | ☐ YES | ☐ NO |
| 6. | | Vessel Pollution Liability ? | ☐ YES | ☐ NO |

**F.** **Aircraft Liability**

| | 1. | Does policy cover all owned and non-owned aircraft? | ☐ YES | ☐ NO |
|---|---|---|---|---|

EXXI000120

2.     Is Contractual Liability coverage provided for contract with
Energy XXI, its subsidiaries and affiliates?      ☐ YES     ☐ NO

3.     Does policy provide $4,000,000 per seat minimum

4.     Has any sublimit for passenger liability been removed

**G.    Umbrella/Excess Liability**

1.     Are limits shown as per MSA      ☐   YES    ☐   NO

2.     Occurrence Form      ☐   YES    ☐   NO

DATE:_____     Signature:_____

COMPANY:_____     NAME:_____

ADDRESS:_____     _____

EXXI000121

SCHEDULE "D"

**EQUAL EMPLOYMENT OPPORTUNITY COMPLIANCE CERTIFICATE**
**SUPPLEMENT TO ENERGY XXI CONTRACTS,**
**PURCHASE ORDERS AND SALES AGREEMENTS**

The undersigned "Contractor" agrees that as to all current contracts, purchase orders, and sales agreements as defined below, heretofore issued or entered into with ENERGY XXI, its affiliates and subsidiaries, hereinafter referred to as " ENERGY XXI" for the purchase or sale of gas, materials, supplies, or services by Contractor and as to each such contract, purchase order and sales agreement, as defined below, which may be hereafter issued or entered into between ENERGY XXI and Contractor at any time within one (1) year following the date of this agreement, the contractor agrees to the provisions set forth and agrees that without further reference thereto the said provisions are and shall be automatically a part of and supplement to each such past and future contract, upon the Contractor, his successors and assigns, to the same extent, effect and purpose as if physically incorporated into such past and future contract, purchase order or sales agreement, and copies therein in extension.

For purposes of this Equal Employment Opportunity Compliance Certificate, the words "Contract", "Purchase Order" or "Sales Agreement" shall mean any agreement or arrangement between ENERGY XXI and the Contractor for the purchase or sale of gas. materials, supplies, or services or for the use of real or personal property, including lease arrangements, which, in whole or in part are necessary to the performance of any one or more contracts between ENERGY XXI and the United States of America or under which any portion of ENERGY XXI's obligation under any one or more contracts is performed, undertaken, or assumed.

(A)     Contractor is aware of and is fully informed of Contractor's responsibilities under Executive Order 11246 and shall file compliance reports as required by Section 203 of Executive Order 11246 and otherwise comply with the requirements for such orders.

(B)     Contractor shall be bound by and agrees to the following provisions as contained in Section 202 of Executive Order 11246, to wit:

(1)     The Contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, age, national origin or disability. The Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, age, national origin or disability. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer, recruitment, or recruitment advertising; layoff or termination; rates of pay or other forms of compensation, and selection for training, including apprenticeship. The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this non-discrimination clause.

(2)     The Contractor will, in all solicitations and advertisements for employees placed by or on behalf of the Contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, age, national origin or disability.

(3)     The Contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer advising the labor union or workers' representative of the contractor's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4)     The Contractor will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5)     The Contractor will furnish all information and reports required by Executive Order No. 11246 of

EXXI000122

September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6)     In the event of the Contractor's non-compliance with the nondiscrimination clauses of this Contract or with any of such rules, regulations, or orders, this Contract may be canceled, terminated, or suspended in whole or in part and the Contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7)     The Contractor will include the provisions of Paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions shall be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for non-compliance: <u>Provided, however,</u> that in the event the Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the Contractor may request the United States to enter into such litigation to protect the interests of the United States.

(C) And further, pursuant to the rules and regulations, if the value of the contract or purchase order exceeds $50,000 or the Contractor has 50 or more employees, Contractor will:

(1)     File, on an annual basis or within 30 days of accepting a new order, complete and accurate reports on Standard Form 100 (EEO 1) with the appropriate government agency (Section 1.7, Chapter 60, Title 41 of the Code of Federal Regulations).

(2)     Develop a written affirmative action compliance program to identify, correct and improve problem areas in the employment and utilization of minority and female personnel (Section 1.40, Chapter 60, Title 41 of the Code of Federal Regulations).

**CERTIFICATION OF NON-SEGREGATED FACILITIES** Contractor certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. Contractor certifies further that it will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it will not permit its employees to perform their services at any location, under its control where segregated facilities are maintained. Contractor agrees that a breach of this certification is a violation of the Equal Employment Opportunity Clause of this agreement. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, creed, color, religion or national origin, because of habit, local custom or otherwise. Contractor further agrees that (except where it has obtained identical certifications from proposed subcontractors for specific time periods) Contractor will obtain identical certifications from proposed subcontractors prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of Equal Employment Opportunity Clause; that it will retain such certification in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods). NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NON-SEGREGATED FACILITIES. A certification of Non-Segregated Facilities, as required by the May 9, 1967 order on Elimination of Segregated Facilities, by the Secretary of Labor (32 Fed.Reg. 7439, May 19, 1967) must be submitted prior to the award of subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Employment Opportunity Clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semi-annually, or annually). (1968 MAR.) (Note: The penalty for making false

EXXI000123

statements in offers is prescribed in 18 U.S.C. 1001).

**CONTRACTOR AND SUBCONTRACTOR LISTING REQUIREMENT** The Contractor agrees to comply with the requirements of Executive Order 11701 and the rules and regulations issued thereunder, and that all employment openings of the contractor which exist at the time of the execution of this Contract and those which occur during the performance of this Contract, including those not generated by the contract and including those occurring at an establishment of the Contractor other than the one wherein the contract is being performed by excluding those of independently operated corporate affiliates, shall, to the maximum extent feasible, be offered for listing at an appropriate local office of the State employment service system wherein the opening occurs and to produce such periodic reports to such local office regarding employment openings and hires as may be required. Provided, that this provision shall not apply to openings which the contractor fills from within the contractor's organization or are filled pursuant to a customary and traditional employer-union hiring arrangement and that the listing of employment openings shall involve only the normal obligations which attach to the placing of job orders. The Contractor agrees further to place the above provision in any subcontract directly under this Contract.

**MINORITY BUSINESS ENTERPRISE** Executive Order 11625 provides that it is the policy of the Government that minority business enterprises shall have the maximum practicable opportunity to participate in the performance of Government contracts. The Contractor agrees to use his best efforts to carry out this policy in the award of his subcontracts in excess of $500,000 to the fullest extent consistent with the efficient performance of the contract. As used in the contract, the term "Minority Business Enterprise" means a business, at least 50 percent of which is owned by minority group members or, in the case of publicly owned businesses, at least 51 percent of the stock of which is owned by minority group members. For the purposes of this definition, minority group members are Negroes, Spanish-speaking American persons, American-Orientals, American-Indians, American Eskimos, and American Aleuts. Contractors may rely on written representations by subcontractors regarding their status as minority business enterprises in lieu of an independent investigation.

**EMPLOYMENT OF VETERANS AND INDIVIDUALS WITH DISABILITIES** Unless otherwise exempted, this purchase order is subject to the affirmative action provision of the Executive Order 11246, the Rehabilitation Act of 1973, the Vietnam Era Veterans Readjustment Act of 1974, and their implementing regulations (41 CFR 60-2, 41 CFR 60-250 and 41 CFR 60-741).

**IMMIGRATION REFORM AND CONTROL ACT** Contractor agrees to comply with the Immigration Reform and Control Act of 1986 and all rules and regulations adopted pursuant thereto which are now or may become applicable to the performance of work by Contractor. Contractor shall protect, defend and hold ENERGY XXI harmless and agrees to pay any and all costs, expenses, losses, claims, demands, suits (including attorney's fees), fines, penalties or judgments which may be asserted or assessed against ENERGY XXI as a result of or in connection with Contractor's use of employees or personnel in violation or alleged violation of such act.

*Dated this___ day of _____ , _____ .*

Name of Contractor

_____

***Signature of Authorized***
Representative for Contractor

_____

Title of Authorized Representative

27

EXXI000124

# SCHEDULE "E"

**ENERGY XXI**
1021 Main Street, Suite 2626
Houston, Texas 77002
Fax:(713)351-3300

**TO:**        All Contractors and Vendors

**RE:**        Contraband Control Policy

ENERGY XXI has adopted a Contraband Control Policy to assure a safe working environment for ENERGY XXI employees and the employees of its contractors.

Measures are being implemented to assure compliance with Company policy in this area. In addition to periodic contraband searches, we require ENERGY XXI employees and other persons on ENERGY XXI premises to cooperate in urine drug screen tests, alcohol breath tests, and any other investigative examinations deemed necessary.

A copy of the notice summarizing ENERGY XXI's policy on contraband control, which is posted at all Company locations, is attached for your reference. Please note the failure of your employees to comply and cooperate with this policy may cause cancellation of your contract with ENERGY XXI. As a contractor whose employees may frequently be on ENERGY xxi's premises, we ask that you cooperate and participate in this program. Please advise your employees who will be working at ENERGY xxi's locations of this program. Additionally, we ask that you also advise any of your subcontractors who may have reason to be on ENERGY XXis premises.

Please sign, date and return one (1) copy of this agreement indicating your acceptance of these terms and conditions for our records.

Company:_____

By: _____

Title _____

Date:_____

28

EXXI000125