**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **GILBERT DAUPHINE, JR.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 16-15370** |
| **REC MARINE LOGISTICS, LLC, ET AL.** | **SECTION "B"(1)** |

<u>**ORDER AND REASONS**</u>

There are five motions for summary judgment before the Court. Defendants and Cross Claimants Shamrock[1], Energy XXI[2], and Wood Group[3] moved for summary judgment on their cross claims against REC Marine Logistics, LLC for defense, indemnity, and insurance coverage. Rec. Docs. 72, 74, 85. Defendant and Cross Defendant REC Marine timely filed an opposition. Rec. Doc. 91. Defendants and Cross Claimants Shamrock, Energy XXI, and Wood Group jointly sought, and were granted, leave to file a reply. Rec. Doc. 99.

Defendant and Cross Defendant REC Marine filed a cross motion for summary judgment on Shamrock's, Energy XXI's, and Wood Group's cross claims for defense, indemnity, and insurance coverage. Rec. Doc. 84. Defendants and Cross Claimants Shamrock, Energy XXI, and Wood Group jointly filed an opposition. Rec. Doc. 92. Defendant and Cross Defendant REC Marine sought, and was granted, leave to file a reply. Rec. Doc. 101.

---

[1] Shamrock Management, LLC ("Shamrock")
[2] Energy XXI USA, Inc.; Energy XXI Gulf Coast, Inc.; Energy XXI, Ltd.; and Energy XXI GOM, LLC (collectively "Energy XXI")
[3] Wood Group PSN, Inc. and Wood Group Production Services, Inc. (collectively "Wood Group")

1

Plaintiff Gilbert Dauphine filed a motion for summary judgment on the questions of whether he is a seaman entitled to maintenance and cure from Defendant and Cross Defendant REC Marine. Rec. Doc. 95. Defendant and Cross Defendant REC Marine timely filed an opposition. Rec. Doc. 109. Plaintiff sought, and was granted, leave to file a reply. Rec. Doc. 114.

For the reasons discussed below,

**IT IS ORDERED** that the motions for summary judgment filed by Defendants and Cross Claimants Shamrock, Energy XXI, and Wood Group (Rec. Docs. 72, 74, 85) are **GRANTED**.

**IT IS FURTHER ORDERED** that the motion for summary judgment filed by Defendant and Cross Defendant REC Marine (Rec. Doc. 84) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's motion for partial summary judgment (Rec. Doc. 95) is **GRANTED** with respect to Plaintiff's status as a seaman and **DENIED** with respect to Plaintiff's demand for cure.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

On May 15, 2010, Energy XXI Services, LLC and REC Marine Logistics, LLC entered into a Master Time Charter agreement (MTC). *See* Rec. Doc. 84-4. The MTC governs how the Charterer (Energy XXI Services, LLC) can charter a vessel from the Owner (REC Marine Logistics, LLC). *See id.* at 3. The Charterer is first supposed to request a vessel from the Owner, in which case the Owner is then

2

supposed to send a Vessel Charter letter to the Charterer with the terms of the Charter. *See id.* at 3. The sample Vessel Charter letter, attached as a schedule to the MTC, contains a clause incorporating the MTC. *See id.* at 18. Every Vessel Charter is supposed to be "substantially identical" to the sample. *See id.* at 3. Unless the Charterer cancels the Vessel Charter, it is effective upon receipt by the Charterer. *See id.* at 3. Even if no Vessel Charter is exchanged, the MTC applies when the Owner delivers a vessel to the Charterer. *See id.* at 3.

The MTC includes an integration clause stating that the MTC and any Vessel Charters "contain[] the entire agreement of Owner and Charterer." *Id.* at 15. When there is a conflict between the MTC and a Vessel Charter, "the provisions in the body of [the MTC] shall prevail." *Id.* No amendments are allowed "except in writing signed by authorized representatives of both Owner and Charterer." *Id.* While the Charterer can "subcharter or assign" the MTC "and/or any Vessel Charter[,]" the Owner must get the "written consent of [the] Charterer" before transferring any of its "rights and obligations under th[e]" MTC. *Id.* at 13.

The MTC also establishes the duties of the Charterer and Owner when a vessel is chartered. Two are especially important for the instant litigation. First, the MTC includes reciprocal defense and indemnity provisions for the Owner and Charterer. *See id.* at 6-11. When applicable, the Owner's defense and indemnity obligations

3

extend to the Charterer's affiliates, parent entities, and contractors. *See id.* at 6-9. Second, the MTC requires the Owner to name, *inter alia*, the Charterer, its affiliates, parent entities, and contractors as additional insureds on its insurance policies. *See id.* at 6-7.

On May 2, 2015, REC Marine sent a one-page document titled "Charter Agreement" to Bubba Richard, an Energy XXI Services, LLC employee. *See* Rec. Doc. 84-7. The Charter Agreement provides for an open-ended charter of the M/V EMILY D to Energy XXI (the Charter Agreement does not specify a subsidiary). *Id.* Bubba Richard, an Energy XXI Services, LLC employee, signed the Charter Agreement. *Id.* The Charter Agreement specifies a daily rate for the charter and provides instructions for where the EMILY D was to report, but neither incorporates the MTC nor includes its own defense and indemnity terms. *See id.* Neither the MTC nor the Charter Agreement were terminated before Plaintiff's accident occurred. *See* Rec. Doc. 74-10 at 10, 20. REC Marine billed Energy XXI, not a specific subsidiary, for the charter of the EMILY D. *See, e.g.*, Rec. Docs. 74-6 at 7; 74-13 at 7. The invoice was sent to the address for Energy XXI Services, LLC that is listed on the first page of the MTC. *See id.* Energy XXI Gulf Coast Inc. paid REC Marine's invoices. *See* Rec. Doc. 74-6 at 13.

The accident at the heart of the instant lawsuit occurred on October 9, 2015. At that time, Plaintiff Gilbert Dauphine was

4

employed by REC Marine Logistics, LLC as a deckhand on the M/V EMILY D, a vessel owned by REC Marine. Rec. Doc. 1 ¶ 6. When the accident occurred, Plaintiff was working on the EMILY D in the Gulf of Mexico as it serviced production platform South Pass 57-B, which is owned and operated by Energy XXI GOM, LLC. *Id.* ¶ 8; Rec. Doc. 74-14 ¶ 4. While the EMILY D was servicing the South Pass 57-B platform, a personnel basket was lowered or dropped onto Plaintiff from a crane on the platform. *Id.* ¶ 8. As a result, Plaintiff suffered physical and mental injuries that allegedly limit his current and future employment opportunities. *Id.* ¶¶ 14-17. Plaintiff further alleges that, as a result of these injuries, he currently needs back and knee surgery. *See* Rec. Doc. 95.

On October 7, 2016, Plaintiff brought suit against REC Marine and three Energy XXI entities (Energy XXI USA, Inc., Energy XXI Gulf Coast, Inc., and Energy XXI, Ltd.). Rec. Doc. 1. Plaintiff subsequently amended his complaint to add as defendants additional Energy XXI entities (Energy XXI GOM, LLC and Energy XXI Services, LLC) and some of Energy XXI's contractors (Shamrock Management, LLC, Wood Group PSN, Inc., and Wood Group Production Services, Inc.). Rec. Docs. 16, 107. Plaintiff brought negligence and unseaworthiness claims against REC Marine under the Jones Act and General Maritime law, seeking damages as well as maintenance and cure. Rec. Doc. 1 ¶¶ 13-20. Plaintiff brought negligence claims against Energy XXI, Shamrock, and Wood Group under General Maritime

5

Law, seeking damages for his injuries. Rec. Docs. 1 ¶¶ 12, 14-20; 16 ¶¶ IV-V; 107 ¶¶ IV-V.

Citing the MTC, Energy XXI, Shamrock, and Wood Group each filed a cross claim for defense, indemnity, and insurance coverage against REC Marine. Rec. Docs. 40, 46, 50. Also, Energy XXI and Shamrock each filed a third party complaint against American Steamship Mutual Indemnity and Protection Association on the basis that the MTC required REC Marine to name Energy XXI and Shamrock as additional insureds. Rec. Docs. 53, 57.

Following the exchange of discovery, Energy XXI, Shamrock, and Wood Group each filed a motion for summary judgment on its respective cross claim, arguing that REC Marine is obligated to provide defense, indemnity, and insurance coverage under the MTC. *See* Rec. Docs. 72, 74, 85. REC Marine filed a cross motion for summary judgment on the same issue, arguing that it is not required to provide defense, indemnity, and insurance coverage under either the MTC or the standalone Charter Agreement. *See* Rec. Doc. 84. Plaintiff also filed a motion for summary judgment on his seaman status and entitlement to cure, specifically back and knee surgery. Rec. Doc. 95.

**LAW AND ANALYSIS**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine

6

issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). A genuine issue of material fact exists if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

When the movant bears the burden of proof, it must "demonstrate the absence of a genuine issue of material fact" using competent summary judgment evidence. *Celotex*, 477 U.S. at 323. But "where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence." *Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994). When the movant meets its burden, the burden shifts to the non-movant, who must show by "competent summary judgment evidence" that there is a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Lindsey*, 16 F.3d at 618.

**A. Cross Motions Regarding Defense, Indemnity, and Insurance Coverage**

To determine whether the defense, indemnity, and insurance coverage provisions in the MTC are applicable, the Court needs to interpret the MTC and the Charter Agreement.[4] "A maritime contract

---

[4] The MTC includes a forum-selection clause stating that disputes about the MTC shall be brought in the Southern District of Texas, Houston Division. *See* Rec. Doc. 74-4 at 11, 15. No party has argued that venue is improper here in the Eastern District of Louisiana. No party has filed a motion to transfer venue.

7

should be read as a whole, and a court should not look beyond the written language of the contract to determine the intent of the parties unless the disputed language is ambiguous." *Channette v. Neches Gulf Marine, Inc.*, 440 F. App'x 258, 260 (5th Cir. 2011) (citing *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 (5th Cir. 1986)). "A contract is unambiguous if its language as a whole is clear, explicit, and leads to no absurd consequences, and as such it can be given only one reasonable interpretation." *Id.* (citing *Chembulk Trading, LLC v. Chemex Ltd.*, 393 F.3d 550, 555 n.6 (5th Cir. 2004)).

The MTC includes a broad defense, indemnity, and insurance coverage provision that encompasses, *inter alia*, personal injury claims by employees of REC Marine against (1) a company that charters vessels from REC Marine and (2) that charterer's affiliates, parent entities, and contractors. *See* Rec. Doc. 74-4 at 7-8. Specifically, the MTC states that the "Owner" owes defense and indemnity to the "Charterer Group." *Id*. at 6-11. The MTC also states that the "Owner" will (1) obtain sufficient insurance for claims that might arise under the MTC and (2) "name Charterer Group as additional insureds" on its insurance policies. Rec. Doc. 74-4 at 6-7. "'Owner' as used in [the MTC] shall include [] the party signing as Owner in [the MTC]," which is REC Marine. Rec. Doc. 74-

---

Accordingly, the court will proceed to analyze the cross motions for summary judgment.

4 at 1, 2, 16. "'Charterer Group' shall mean" the "Charterer; its parent, subsidiaries, affiliates, partners and limited partners;" and "the contractors and subcontractors" thereof. Rec. Doc. 74-4 at 6.

The first point of debate among the parties focuses on the definition of "Charterer." REC Marine argues that, because only Energy XXI Services, LLC signed the MTC, only Energy XXI Services, LLC can charter a vessel under the MTC. *See* Rec. Doc. 84-1 at 3-5, 6-9. REC Marine's position is that Energy XXI Services, LLC did not charter the EMILY D because (1) Energy XXI GOM, LLC owned the platform where the EMILY D was working when Plaintiff was injured and (2) Energy XXI Gulf Coast, Inc. paid REC Marine's invoice. *See id.* Energy XXI, Shamrock, and Wood Group argue that the MTC applies because Energy XXI Services, LLC is the contracting entity for all Energy XXI entities. *See* Rec. Docs. 72-1 at 9-10; 74-1 at 6-7; 85-1 at 3-4.

The MTC states that "'Charterer' shall mean the entity listed on page one of [the MTC], which is requesting for its own account that Owner provide vessel(s) and/or services to such entity." Rec. Doc. 74-4 at 2. The entity listed on the first page of the MTC is "Energy XXI Services, LLC." Rec. Doc. 74-4 at 1. REC Marine advances an incredibly restrictive interpretation of this definition, arguing that the phrases "for its own account" and "provide vessel(s) . . . to such entity" mean that the MTC only

9

applies when Energy XXI Services, LLC requests a vessel to work on structures owned by Energy Services, LLC. *See* Rec. Docs. 84-1 at 7; 97-1 at 2. This is not the natural or reasonable interpretation of the MTC's definition of the term "Charterer." *See Holmes Motors, Inc. v. BP Expl. & Prod., Inc.*, 829 F.3d 313, 315-16 (5th Cir. 2016) ("Under admiralty law, a contract should be read as a whole and its words given their plain meaning unless the provision is ambiguous.").

First, the phrase "for its own account" requires that the entity requesting the vessel assume financial responsibility for the charter. The Oxford English Dictionary defines the phrase "on one's own account" to mean "for one's own interest, and at one's own risk[.]" *On (also upon) one's own account*, Oxford English Dictionary (3d ed. 2011). This understanding of the phrase makes sense in context because a primary purpose of the MTC is to allocate and clarify the parties' obligations with respect to the Vessel, notably, the Charterer is required to pay for the charter. *See* Rec. Doc. 74-4 at 4.

Second, there is no indication that the phrase "provide vessel(s) . . . to such entity" limits how the Charterer can use the vessel it seeks to charter. The natural reading of this phrase simply states what a Charterer does, namely ask a vessel owner for use of a vessel. The Oxford English Dictionary defines a "charterer" as "[o]ne who hires a vessel under a charter-party."

*Charterer*, Oxford English Dictionary (3d ed. 2011). A "charter-party" is defined as "[t]he charter or deed made between owners and merchants for hire of a ship . . . ." *Charter-party*, Oxford English Dictionary (3d ed. 2011). Neither definition implies that the term "Charterer" incorporates a restriction on the vessel's use.

This plain language understanding of "provide vessel(s) . . . to such entity" is consistent with later provisions in the MTC that require the Charterer, when requesting a vessel, to describe its intended use of the vessel. *See* Rec. Doc. 74-4 at 3. At that time, the Owner can decide if it wants to charter a vessel for that specified use. *See id.* If, as REC Marine suggests, the definition of "Charterer" somehow contained its own restrictions on the use of the vessel, the two provisions would be superfluous, suggesting further that REC Marine's suggested interpretation of the term "Charterer" is incorrect. *See Foster Wheeler Energy Corp. v. An Ning Jiang MV*, 383 F.3d 349, 354 (5th Cir. 2004) ("Federal courts sitting in admiralty adhere to the axiom that a contract should be interpreted so as to give meaning to all of its terms—presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous.").

REC Marine also argues that the MTC is only applicable if Energy XXI Services, LLC paid for the charter itself. *See* Rec. Doc. 7-8. In support of this argument, REC Marine cites a provision

11

from the "Payment" section of the MTC that states, "[f]or the use of said Vessel, Charterer shall pay Owner charter hire at the daily charter rate agreed upon in the applicable Vessel Charter for each day . . . ." Rec. Doc. 74-4 at 4. But this provision is separate from the "Definitions" section, suggesting that the identity of the payer is not part of the definition of "Charterer." Instead, the reasonable conclusion is that the "Payment" provision stands for the unremarkable proposition that the Charterer must pay the Owner for its use of the vessel.

In fact, REC Marine appears to agree with this common sense interpretation. In his 30(b)(6) deposition, REC Marine's owner implied that the company pays little attention to who pays the invoices "as long as they pay . . . ." Rec. Doc. 85-4 at 14. This attitude further suggests that the parties did not intend the identity of the invoice payer to determine whether the MTC applied to a given charter. Moreover, it would make little sense for the applicability of the MTC to depend on the identity of the invoice payer because, if a Charterer was liable for an accident, it could after-the-fact escape its defense and indemnity obligations under the MTC by having a different subsidiary pay the invoice. This is the type of "absurd consequence" that should be avoided when interpreting a contract.

The parties' actions in connection with the charter of the EMILY D are consistent with the conclusion that Energy XXI

Services, LLC was a Charterer for purposes of the MTC. Sometime on or before May 2, 2015, Bubba Richard, an employee of Energy XXI Services, LLC, requested a vessel from REC Marine. *See* Rec. Doc. 84-7. REC Marine memorialized the request in a "Charter Agreement," which was sent back to Mr. Richard for his signature. *See id.* The "Charter Agreement" does not contain billing information, but the invoices were sent to the attention of an "Energy XXI" accounts payable clerk at the address for Energy XXI Services, LLC that was listed on the first page of the MTC. *See* Rec. Docs. 74-4 at 1; 74-6 at 7. Based on a plain and natural understanding of the term "Charterer" as defined in the MTC, Energy XXI Services, LLC was a "Charterer" when one of its employees requested a vessel from REC Marine, the vessel was provided pursuant to the instructions from the Energy XXI Services, LLC employee, and the invoices for the use of the vessel were sent to the address for Energy XXI Services, LLC. Therefore, the MTC applied to the charter of the EMILY D at issue in this case.

The second point of debate among the parties focuses on the relationship between the MTC and the subsequently-executed "Charter Agreement." Specifically, the parties disagree about whether the defense, indemnity, and insurance coverage provisions of the MTC apply to the Charter Agreement. REC Marine argues that they do not apply because the Charter Agreement (1) is not "substantially identical" to the sample Vessel Charter attached to

13

the MTC and (2) does not include language expressly incorporating the MTC. *See* Rec. Doc. 84-1 at 4-5. Energy XXI, Shamrock, and Wood Group advocate the opposite conclusion based on parties' intent for the MTC to apply to all vessels chartered by Energy XXI Services, LLC from REC Marine. *See* Rec. Docs. 72-1 at 3; 74-1 at 2; 85-1 at 6.

While REC Marine is correct that the "Charter Agreement" lacks language expressly incorporating the MTC, this silence is not sufficient to rebut the parties' unambiguous and emphatic intent for the MTC to govern when Energy XXI Services, LLC charters a vessel from REC Marine. First, the MTC states that the Vessel Charter used should be "substantially identical" to the sample attached to the MTC. Rec. Doc. 74-4 at 3. The Charter Agreement in fact shares many similarities with the sample Vessel Charter. Both documents state when and where the charter will begin, identify the vessel to be chartered, quote the daily rate, include special provisions, and provide signature blocks for the Charterer and Owner. *Compare* Rec. Doc. 74-4 at 18 *and* Rec. Doc. 84-7. The only significant difference is that the sample Vessel Charter includes a statement that the charter is "[p]ursuant to the terms and conditions" of the MTC. *See* Rec. Doc. 74-4 at 18. This difference merits further discussion because it is relevant to the instant dispute over defense, indemnity, and insurance coverage. But it is not dispositive.

14

Second, the MTC makes clear that the Vessel Charter is not necessary for Energy XXI Services, LLC to charter a vessel from REC Marine pursuant to the terms of the MTC. "Even if Owner shall fail to send such confirmation letter or Charterer shall fail to acknowledge such letter, [the MTC] shall apply to any Vessel delivered to Charterer by Owner unless the Vessel Charter is cancelled by Charterer." Rec. Doc. 74-4 at 3. Here, REC Marine delivered the EMILY D to Energy XXI Services, LLC. Therefore, even if there had been no written communication between the parties, any resulting charter would have been pursuant to the MTC.

Third, the integration clause in the MTC makes clear that the parties wanted the MTC, with its defense, indemnity, and insurance coverage provisions, to prevail over any subsequently-executed documents. The integration clause states:

> [The MTC], together with any and all Schedules attached hereto and any Vessel Charters, supersedes all other agreements, oral or written, heretofore made with respect to the subject matter hereof and the transactions contemplated hereby, and it contains the entire agreement of Owner and Charterer. *In the event of a conflict between the body of this Agreement and any of the attached Schedules or any Vessel Charters, the provisions in the body of this Agreement shall prevail.* This Agreement, including the attached Schedules and any Vessel Charters, shall not be amended or modified except in writing signed by authorized representatives of both Owner and Charterer. . . . *Each party agrees that the Agreement and any Vessel Charters have been purposefully drawn and correctly reflect their understanding of the transactions that the parties contemplate.*

Rec. Doc. 74-4 at 15-16 (emphasis added). Therefore, the MTC, with its defense, indemnity, and insurance coverage provisions, would prevail over any later-executed Vessel Charters that had inconsistent language. Also, the MTC states that the parties "purposefully dr[ew]" the MTC and sample Vessel Charter so that the defense and indemnity provisions would apply to charters. The Charter Agreement at issue does not disclaim the MTC or declare that neither party will have defense, indemnity, or insurance coverage obligations; instead, the Charter Agreement is silent on the issue. Given the otherwise consistent evidence that the parties intended defense, indemnity, and insurance provisions to apply when a Vessel was chartered, the parties' subsequent silence on the issue is not sufficient to defeat the MTC.[5] *See Tippmann Constr. Inc. v. Prof'l Serv. Indus., Inc.*, No. 4:11-CV-591-Y, 2013 WL 169267, at *4-5 (N.D. Tex. Jan. 16, 2013) (explaining that contracts executed at different times will be interpreted together when they refer to the same subject matter).

---

[5] REC Marine argues that *Channette v. Neches Gulf Marine, LLC*, 440 F. App'x 258 (5th Cir. 2011), forecloses the argument that the MTC and Charter Agreement should be read together. *See* Rec. Docs. 91 at 9; 101 at 7. In *Channette*, the Fifth Circuit reasoned that a subsequently-executed charter agreement was not part of a previously-executed master agreement because the charter agreement did not incorporate the master contract by reference. *See Channette*, 440 F. App'x at 262-63. But the master contract at issue in *Channette* stated that "[t]he terms and provisions of th[e] [m]aster [a]greement shall not, however, be applicable to the charter of any vessel upon which such a separate time charter is executed." *Id.* at 262. Therefore, the master contract in *Channette* envisioned situations in which the parties would charter vessels on terms different from those memorialized in the master contract. The contract at issue in this case has no such limitation and offers no indication that the parties envisioned any future charters where the MTC would not apply. Therefore, *Channette* does not control the instant dispute.

Fourth, both parties testified that it would be rare for a company to charter a vessel without a master time charter agreement. *See* Rec. Docs. 74-5 at 32-33; 74-10 at 15. When two companies spend time and resources negotiating a detailed contract for the purpose of chartering vessels, it would be surprising for the parties to later charter a vessel in a skeletal one-page contract—especially without any explicit indication that the parties intended to disregard the previously-negotiated contract. The fact that the Charter Agreement does not explicitly incorporate the defense and indemnity does not alter the Court's conclusions that those provisions apply to the charter of the EMILY D at issue in this case.[6] *See Tajonera v. Black Elk Energy Offshore Operations, LLC*, No. 13-0366, 2014 WL 431340, at *7 (E.D. La. Feb. 4, 2014) (explaining that it is common for a "blanket contract" and individual work orders to be interpreted together).

Therefore, as a matter of law, (1) the MTC was applicable when the EMILY D was chartered because Energy XXI Services, LLC was the Charterer and (2) the MTC and Charter Agreement are read together as one contract. Therefore, the defense, indemnity, and insurance coverage provisions of the MTC are in effect. *See* Rec.

---

[6] The parties devote a fair amount of time debating whether REC Marine is judicially estopped from arguing that the MTC is inapplicable because REC Marine submitted a claim in the Energy XXI bankruptcy that was based on work performed under the MTC. *See* Rec. Docs. 85-1 at 9-10; 92 at 3; 101 at 4-6. Because the MTC and Charter Agreement are unambiguous and entitle Cross Claimants to defense, indemnity, and insurance coverage, it is unnecessary to reach the judicial estoppel argument.

Doc. 74-4 at 6-11. The parties do not appear to dispute that, if Energy XXI Services, LLC is the Charterer, the benefits of the MTC extend to the remaining Cross Claimants as affiliates and contractors of Energy XXI Services, LLC. As set out in the MTC, when an Owner initially denies defense, indemnity, and insurance coverage, the defense obligation encompasses "payment of . . . any attorneys' fees, costs and expenses associated with recovery of the indemnified party's claims for defense, insurance or indemnity." Rec. Doc. 74-4 at 10.

**B. Plaintiff's Motion Regarding Seaman Status and Cure**

Plaintiff also filed a motion for partial summary judgment on two issues: (1) whether he is entitled to seaman status and (2) whether he is entitled to cure in the form of back and knee surgeries. Rec. Doc. 95. To be a seaman, "1) an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission, and 2) a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." *Wilcox v. Wild Well Control*, 794 F.3d 531, 536 (5th Cir. 2015) (citing *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995)). The parties agree that Plaintiff worked for REC Marine as a deckhand on the EMILY D and the performance of his duties contributed to the EMILY D's mission as a utility vessel. *See* Rec. Docs. 95-7; 95-12 ¶¶ 1, 5; 109-10 at 2. In fact, REC Marine admits

that Plaintiff was a seaman. Rec. Doc. 95-6 at 1. Therefore, there is no genuine issue of material fact about whether Plaintiff was a seaman. *See In re Two-J Ranch, Inc.*, 534 F. Supp. 2d 671, 682-83 (W.D. La. 2008).

The question then becomes whether Plaintiff is entitled to the cure he presently demands, namely back and knee surgery. "Maintenance and cure is an obligation imposed upon a shipowner to provide for a seaman who becomes ill or injured during his service to the ship." *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002). "The duty to provide cure encompasses not only the obligation to reimburse medical expenses already incurred, but also to ensure that the seaman receives the proper treatment and care . . . [until] maximum cure has been reached, *i.e.,* where it is probable that further treatment will result in no betterment in the claimant's condition." *Id.* "[C]onflicting diagnoses and prognoses from various physicians present a question of fact as to the seaman's entitlement to maintenance and cure benefits."[7] *Howard v. Offshore Liftboats, LLC*, No. 13-4811, 2015 WL 5944310, *6 (E.D. La. Oct. 13, 2015); *see also Snyder v. L&M Boat Rental, Inc.*, 924 F. Supp. 2d 728, 733-34 (E.D. La. 2013); *Domingue v. Offshore Serv.*

---

[7] Plaintiff relies heavily on *Vaughn v. Atkinson*, 369 U.S. 527 (1962), for the proposition that the Court should resolve conflicting facts in favor of Plaintiff, even at the summary judgment stage of proceedings. *See* Rec. Doc. 95-1 at 11-16. But Plaintiff points to no case in which a court has taken this position. Plaintiff instead cites cases where *Vaughn* was applied at *trial.*

*Vessels, LLC*, No. 08-4668, 2010 WL 936295, at *2-3 (E.D. La. Mar. 11, 2010).

Plaintiff seeks payment for a "C5-6 and C6-7 anterior cervical discectomy and fusion as well as arthroscopic surgery on his left knee . . . ." Rec. Doc. 95 at 1. One of Plaintiff's doctors opines that Plaintiff is not yet at maximum medical improvement (MMI) and should undergo the back and knee surgeries. *See* Rec. Doc. 95-5 at 3, 18. REC Marine hired Dr. Christopher Cenac to examine Plaintiff and Plaintiff's medical records. Dr. Cenac concluded that Plaintiff "has long since reached MMI for any injuries sustained to the cervical spine, lumbar spine, or left knee." Rec. Doc. 109-6 at 8. Dr. Cenac specifically "do[es] not agree that the recommended surgical procedure to the cervical spine is medically necessary or clinically indicated." *Id.* These conflicting medical opinions raise a genuine issue of material fact about Plaintiff's right to cure at this time because they create the possibility that a jury could reasonably conclude that Plaintiff has already reach MMI. *See Howard*, 2015 WL 5944310 at *6 (denying a plaintiff's motion for partial summary judgment on his entitlement to cure because of conflicting evidence about plaintiff's "proper diagnosis and treatment needs").

New Orleans, Louisiana, this 27th day of March, 2018.

_____
SENIOR UNITED STATES DISTRICT JUDGE